# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE
2025 AUG 22  AM 11: 40

Patrice Noel

_____

_____

Write the full name of each plaintiff.

-against-

NEIGHBORHOOD DEFENDER SERVICE INC., ZAINAB AKBAR, CAROLYN
KLEMENS, DANTÉ BROWNE, MATTHEW KNECHT, SHANNON ANGLERO,
PIYALI BASAK, JACOB SCHNEIDER, AMY ARMSTRONG, MYRANDA
MENDEZ, ROXANNA GUTIERREZ, and RICK JONES

Write the full name of each defendant. The names listed
above must be identical to those contained in Section I.

## 25 CV 6995

_____CV_____
(Include case number if one has been
assigned)

Do you want a jury trial?

☒ Yes    ☐ No

# EMPLOYMENT DISCRIMINATION COMPLAINT

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with
the court should therefore *not* contain: an individual's full social security number or full birth
date; the full name of a person known to be a minor; or a complete financial account number. A
filing may include *only*: the last four digits of a social security number; the year of an individual's
birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule
of Civil Procedure 5.2.

## I.    PARTIES

### A.    Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

| Patrice | | Noel |
|---|---|---|
| First Name | Middle Initial | Last Name |

| 14 Knolltop Rd | | |
|---|---|---|
| Street Address | | |

| Elmsford | NY | 10523 |
|---|---|---|
| County, City | State | Zip Code |

| 914-312-7646 | PN1356A@gmail.com |
|---|---|
| Telephone Number | Email Address (if available) |

### B.    Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. (Proper defendants under employment discrimination statutes are usually employers, labor organizations, or employment agencies.) Attach additional pages if needed.

Defendant 1:

| Neighborhood Defender Service, Inc. | | |
|---|---|---|
| Name | | |
| 317 Lenox Ave, 10th FL | | |
| Address where defendant may be served | | |
| New York | NY | 10027 |
| County, City | State | Zip Code |

Defendant 2:

| See Attached Defendant List | | |
|---|---|---|
| Name | | |
| | | |
| Address where defendant may be served | | |
| | | |
| County, City | State | Zip Code |

Defendant 3:

| | |
|---|---|
| Name | |
| Address where defendant may be served | |
| County, City | State | Zip Code |

## II.    PLACE OF EMPLOYMENT

The address at which I was employed or sought employment by the defendant(s) is:
Neighborhood Defender Service, Inc.

| Name | | |
|---|---|---|
| 317 Lenox Ave, 10th FL | | |
| Address | | |
| New York | NY | 10027 |
| County, City | State | Zip Code |

## III.    CAUSE OF ACTION

### A.    Federal Claims

This employment discrimination lawsuit is brought under (check only the options below that apply in your case):

☒    **Title VII of the Civil Rights Act of 1964**, 42 U.S.C. §§ 2000e to 2000e-17, for employment discrimination on the basis of race, color, religion, sex, or national origin

The defendant discriminated against me because of my (check only those that apply and explain):

☒    race:            African American

☐    color:          _____

☐    religion:       _____

☒    sex:            Female

☐    national origin: _____

☒ **42 U.S.C. § 1981,** for intentional employment discrimination on the basis of race

My race is: <u>Black</u>

☐ **Age Discrimination in Employment Act of 1967,** 29 U.S.C. §§ 621 to 634, for employment discrimination on the basis of age (40 or older)

I was born in the year: _____

☐ **Rehabilitation Act of 1973,** 29 U.S.C. §§ 701 to 796, for employment discrimination on the basis of a disability by an employer that constitutes a program or activity receiving federal financial assistance

My disability or perceived disability is: <u>ADHD & PTSD</u>

☒ **Americans with Disabilities Act of 1990,** 42 U.S.C. §§ 12101 to 12213, for employment discrimination on the basis of a disability

My disability or perceived disability is: <u>ADHD & PTSD</u>

☐ **Family and Medical Leave Act of 1993,** 29 U.S.C. §§ 2601 to 2654, for employment discrimination on the basis of leave for qualified medical or family reasons

## B. Other Claims

In addition to my federal claims listed above, I assert claims under:

☒ **New York State Human Rights Law,** N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status

☒ **New York City Human Rights Law,** N.Y. City Admin. Code §§ 8-101 to 131, for employment discrimination on the basis of actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation, alienage, citizenship status

☐ Other (may include other relevant federal, state, city, or county law):

_____

## IV.    STATEMENT OF CLAIM

### A.    Adverse Employment Action

The defendant or defendants in this case took the following adverse employment actions against me (check only those that apply):

- ☐    did not hire me
- ☒    terminated my employment
- ☐    did not promote me
- ☒    did not accommodate my disability
- ☒    provided me with terms and conditions of employment different from those of similar employees
- ☒    retaliated against me
- ☒    harassed me or created a hostile work environment
- ☐    other (specify): _____

### B.    Facts

State here the facts that support your claim. Attach additional pages if needed. You should explain what actions defendants took (or failed to take) *because of* your protected characteristic, such as your race, disability, age, or religion. Include times and locations, if possible. State whether defendants are continuing to commit these acts against you.

See Attached Complaint Listing Factual Allegations.

As additional support for your claim, you may attach any charge of discrimination that you filed with the U.S. Equal Employment Opportunity Commission, the New York State Division of Human Rights, the New York City Commission on Human Rights, or any other government agency.

## V.    ADMINISTRATIVE PROCEDURES

For most claims under the federal employment discrimination statutes, before filing a lawsuit, you must first file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) and receive a Notice of Right to Sue.

Did you file a charge of discrimination against the defendant(s) with the EEOC or any other government agency?

☒    Yes (Please attach a copy of the charge to this complaint.)

When did you file your charge?    January 28, 2025

☐    No

Have you received a Notice of Right to Sue from the EEOC?

☒    Yes (Please attach a copy of the Notice of Right to Sue.)

What is the date on the Notice?    June 18, 2025

When did you receive the Notice?    June 18, 2025

☐    No

## VI.    RELIEF

The relief I want the court to order is (check only those that apply):

☐    direct the defendant to hire me

☐    direct the defendant to re-employ me

☐    direct the defendant to promote me

☐    direct the defendant to reasonably accommodate my religion

☒    direct the defendant to reasonably accommodate my disability

☒    direct the defendant to (specify) (if you believe you are entitled to money damages, explain that here)
      SEE ATTACHED COMPLAINT FOR PRAYER FOR RELIEF.

## VII.   PLAINTIFF'S CERTIFICATION

By signing below, I certify to the best of my knowledge, information, and belief that:
(1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 8/21/25 | | |
| --- | --- | --- |
| Dated | | Plaintiff's Signature |
| Patrice | L | Noel |
| First Name | Middle Initial | Last Name |
| 14 Knolltop Rd | | |
| Street Address | | |
| Elmsford | NY | 10523 |
| County, City | State | Zip Code |
| 914-312-7646 | pn1356a@gmail.com | |
| Telephone Number | Email Address (if available) | |

I have read the attached Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☒ Yes   ☐ No

    If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

## DEFENDANT INFORMATION ATTACHMENT

**Neighborhood Defender Service, Inc.**
317 Lenox Avenue, 10th Floor
New York, NY 10027

**Zainab Akbar**
c/o Neighborhood Defender Service, Inc.
317 Lenox Avenue, 10th Floor
New York, NY 10027

**Carolyn Klemens**
c/o Neighborhood Defender Service, Inc.
317 Lenox Avenue, 10th Floor
New York, NY 10027

**Danté Browne**
c/o Neighborhood Defender Service, Inc.
317 Lenox Avenue, 10th Floor
New York, NY 10027

**Matthew Knecht**
c/o Neighborhood Defender Service, Inc.
317 Lenox Avenue, 10th Floor
New York, NY 10027

**Shannon Anglero**
c/o Neighborhood Defender Service, Inc.
317 Lenox Avenue, 10th Floor
New York, NY 10027

**Piyali Basak**
c/o Neighborhood Defender Service, Inc.
317 Lenox Avenue, 10th Floor
New York, NY 10027

**Jacob Schneider**
c/o Neighborhood Defender Service, Inc.
317 Lenox Avenue, 10th Floor
New York, NY 10027

**Amy Armstrong**
c/o Neighborhood Defender Service, Inc.
317 Lenox Avenue, 10th Floor
New York, NY 10027

**Myranda Mendez**
c/o Neighborhood Defender Service, Inc.
317 Lenox Avenue, 10th Floor
New York, NY 10027

**Roxanna Gutierrez**
c/o Neighborhood Defender Service, Inc.
317 Lenox Avenue, 10th Floor
New York, NY 10027

**Rick Jones** (Executive Director)
c/o Neighborhood Defender Service, Inc.
317 Lenox Avenue, 10th Floor
New York, NY 10027

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | 520-2025-01835 |
| ☒ EEOC | |

**New York State Division Of Human Rights**                    and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Patrice Noel** | **914-312-7646** | **05/22/1991** |

| Street Address | City, State and ZIP Code |
|---|---|
| **14 Knolltop Road, Elmsford, NY 10523** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **Neighborhood Defender Services, Inc** | **285** | **(212) 876-5500** |

| Street Address | City, State and ZIP Code |
|---|---|
| **317 Lenox Ave, New York, NY 10027** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **10/17/2024**    Latest **12/12/2024**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

SEE ATTACHED.

**Equal Employment Opportunity Commission**
**New York District Office**
**Received: January 28, 2025**

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

01/28/2024
*Date*

*Patrice Noel*
*Charging Party Signature*

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(month, day, year)*

**On October 17, 2024,** during a meeting with the managing attorney, I was informed I would need to participate in daily check-ins with my supervisor, Myranda Mendez, due to perceived deficiencies reported by Amy Armstrong (A.A.), my team supervisor. Immediately after, I verbally requested an accommodation to avoid these check-ins, as they triggered my PTSD. This request was denied, and **NDS failed to engage in the interactive process** or provide a reasonable accommodation, violating the **ADA (§ 1630.2(o)(3), § 12112(b)(5)(A)).**

The daily check-ins were unnecessary, exacerbated my condition, and yielded no benefit. I had not been given an opportunity to self-correct, and my work had no negative outcomes. On **November 20, 2024,** I formally submitted an accommodation request through my therapist, which was approved on **November 25, 2024.** However, between October 17 and November 25, the micromanagement and harassment fostered a **hostile work environment** that worsened my PTSD, in violation of the **ADA.**

On **November 26, 2024,** I requested to conduct intake from home for two days to avoid Amy Armstrong, who had solicited complaints about me and refused to engage in conflict resolution. This request aligned with my approved accommodation to opt out of non-critical meetings. Carolyn Klemens, the HR representative, denied this request, claiming intake from home was not permitted. The managing attorney also denied it, citing intake as essential, despite remote intake being performed during the pandemic. **NDS again denied me reasonable accommodation, violating the ADA (§ 12112(b)(5)(A)).**

Carolyn Klemens later requested a Microsoft Teams meeting with me and Dante Taylor, another HR representative, to discuss accommodations. I agreed but requested to have a union representative or support person present to prevent escalation or miscommunication. This **reasonable request was denied,** violating the **ADA.** During the meeting, I requested clarification on why my request was unreasonable and justified remote intake as feasible. I reiterated that PTSD symptoms were triggered by my supervisor and explained that intake could be done over the phone and online, as proven during the pandemic. A former supervisor had previously allowed remote intake without issue.

In the meeting, I explained how PTSD manifests and why accommodations were necessary. I provided a hypothetical, noting that during a triggering episode, being in Amy Armstrong's presence could lead to verbal or physical aggression. This example highlighted the severity of symptoms and the importance of prevention for workplace safety. **HR misconstrued this as a physical threat, leading to my suspension, which constitutes retaliation under the ADA (§ 12203(a)).** Despite clarifying my statements, I was not allowed to defend myself.

Two weeks later, I was informed my suspension had been converted to termination. **This discriminatory discharge violates the ADA (§ 12112(a)).** My termination followed misinterpretation of disability-related behavior and occurred while I was pursuing accommodations. Despite requesting union involvement, HR denied me further clarification or opportunities to revisit the decision.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
PATRICE NOEL,

<table>
<tr><td>Plaintiff,</td><td>Civil Action No.</td></tr>
<tr><td>-against-</td><td>**COMPLAINT**</td></tr>
</table>

|  |  |
|---|---|
| Plaintiff, | Civil Action No. |
| -against- | **COMPLAINT** |
| NEIGHBORHOOD DEFENDER SERVICE INC., | **JURY TRIAL** |
| ZAINAB AKBAR, CAROLYN KLEMENS, | **DEMANDED** |

NEIGHBORHOOD DEFENDER SERVICE INC.,     **JURY TRIAL**
ZAINAB AKBAR, CAROLYN KLEMENS,          **DEMANDED**
DANTÉ BROWNE, MATTHEW KNECHT,
SHANNON ANGLERO, PIYALI BASAK,
JACOB SCHNEIDER, AMY ARMSTRONG,
MYRANDA MENDEZ, ROXANNA GUTIERREZ,
and RICK JONES
                              Defendants.
-------------------------------------------------------X

## STATEMENT OF THE CASE

1.        This is a civil rights action against Neighborhood Defender Service of Harlem

("NDS") for discriminating against and retaliating against Patrice Noel, a Black, disabled Army

veteran and neurodivergent professional, in violation of federal, state, and city law.

2.        Hired for her legal skill and lived experience with systemic injustice, Ms. Noel

was instead met with disbelief, control, and punishment after disclosing her PTSD and ADHD.

3.        She repeatedly warned that the daily micromanagement NDS imposed would

harm her health and performance, yet the organization ignored her disclosures, denied

accommodations, and ultimately twisted a disability-related explanation into a pretext for

termination—one day after approving her accommodation request.

4.        This case challenges not only the loss of her job, but the systemic disregard for

disability rights and racial equity within an organization that claims to defend them.

1

## PRELIMINARY STATEMENT

5.        This case exposes a profound contradiction: an organization that claims to defend justice and equality instead turned its own workplace into a site of discrimination, retaliation, and abuse. Behind its public commitments to equity, Neighborhood Defender Service ("NDS") ignored disability disclosures, denied accommodations, and weaponized supervision against the very employee it recruited for her skill and resilience. What unfolded was not an ordinary employment dispute; it was the predictable result of an institution choosing control over compliance, and punishment over protection.

6.        Plaintiff Patrice Noel's termination was not the product of misconduct or incompetence. It was the culmination of deliberate choices by NDS leadership: to disregard her disclosures of PTSD and ADHD, to intensify rather than adjust harmful practices, and to penalize her for insisting on her rights.

7.        Ms. Noel repeatedly informed her supervisors that the daily check-in structure they imposed would worsen her PTSD and ADHD symptoms. Rather than modify or remove it, NDS doubled down—then pointed to the predictable decline in her functioning as a pretext for discipline and termination.

8.        The Americans with Disabilities Act (ADA) and related laws do not carve out exceptions for "probationary" employees, nor do they permit employers to approve an accommodation one day and punish an employee the next for the very limitations that accommodation was meant to address.

9.        This action seeks to hold NDS accountable for its violations of federal, state, and city law. It seeks redress for the unlawful termination of a disabled Black veteran and a

2

declaration that disability rights and racial equity are not aspirational ideals—they are binding

obligations that no employer may ignore.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343

because this action arises under the Constitution and laws of the United States, including the

Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq.; Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq.; and 42 U.S.C. § 1981.

11.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over

Plaintiff's related claims under the New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. Law § 290 et seq.; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin.

Code § 8-101 et seq.; and New York common law claims. These claims arise from the same

nucleus of operative fact as the federal claims.

12.     The Court has pendent party jurisdiction under 28 U.S.C. § 1367(a) over the

individual defendants with respect to Plaintiff's state and city law claims, as those claims arise

from the same events and facts as the federal claims asserted.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial

part of the events or omissions giving rise to these claims occurred in this District. Defendant

NDS is headquartered here, the individual defendants worked here during the relevant time, and

all acts of discrimination, retaliation, and other unlawful conduct occurred within this District.

## ADMINISTRATIVE PROCEDURES

14.     Prior to initiating this action, Plaintiff Patrice Noel timely filed a Charge of

Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against her

employer, Defendant Neighborhood Defender Service Inc. ("NDS"), alleging violations of the

Americans with Disabilities Act of 1990 ("ADA") and Title VII of the Civil Rights Act of 1964 ("Title VII").

15.        On or about June 18, 2025, the EEOC issued Plaintiff a Notice of Right to Sue, attached as *Exhibit A*. This action is filed within ninety (90) days of Plaintiff's receipt of that notice. Accordingly, all administrative prerequisites to bring claims against NDS have been satisfied.

16.        In addition to her EEOC charge, Plaintiff pursued internal remedies through her union under the Collective Bargaining Agreement ("CBA"), filing a grievance challenging her suspension and termination. She participated in both Step 1 and Step 2 grievance hearings, and the matter remains pending in arbitration.

17.        Before commencing this litigation, Plaintiff also sent eleven (11) detailed demand letters to NDS and its leadership, outlining her claims, factual chronology, and supporting evidence. These letters contain allegations and documentation that directly align with, and in some instances expand upon, the facts set forth in this Complaint. NDS refused to forward two of these letters to their intended recipients, further obstructing resolution.

18.        Plaintiff's claims against the individual Defendants are not brought under federal law but arise under the NYSHRL, the NYCHRL, and related state tort law. These claims do not require exhaustion of federal administrative remedies.

19.        All other conditions precedent to the filing of this action have been satisfied, waived, or are inapplicable.

## PARTIES

20.      Plaintiff Patrice Noel is a resident of New York and, at all relevant times, was employed in New York County. She is an "employee" under the ADA of 1990, Title VII, the NYSHRL, and the NYCHRL.

21.      Upon information and belief, Defendant Neighborhood Defender Service Inc. ("NDS" or "NDS Inc.") is a not-for-profit legal services organization with its principal place of business in New York County. NDS Inc. operates as "Neighborhood Defender Service of Harlem" and is an "employer" under the applicable laws.

22.      Upon information and belief, Defendant Amy Armstrong is a resident of New York and, at all relevant times, served as Plaintiff's Team Supervisor in the Family Defense Practice ("FDP") at NDS Harlem. Armstrong made vague, subjective complaints about Plaintiff's work style and performance without addressing them directly with Plaintiff. Instead, she escalated them to Defendant Zainab Akbar, which led to the imposition of the medically contraindicated daily supervisory structure. She is subject to the jurisdiction of this Court for acts committed in New York County in her individual capacity under color of law.

23.      Upon information and belief, Defendant Zainab Akbar is a resident of New York and, at all relevant times, served as Managing Attorney of the FDP at NDS Harlem and Plaintiff's supervisor. Akbar implemented the daily check-in supervisory structure, ignored verbal and written accommodation requests, and later interfered with the grievance process. She is subject to the jurisdiction of this Court for acts committed in New York County in her individual capacity under color of law.

24.      Upon information and belief, Defendant Jacob Schneider is a resident of New York and, at all relevant times, served as Deputy Managing Attorney of the FDP at NDS Harlem.

Schneider had direct knowledge of Plaintiff's PTSD-related accommodation requests and failed to intervene or ensure compliance. He is subject to the jurisdiction of this Court for acts committed in New York County in his individual capacity under color of law.

25.     Upon information and belief, Defendant Myranda Mendez is a resident of New York and, at all relevant times, was Plaintiff's direct supervisor. Mendez enforced daily check-ins despite knowing they exacerbated Plaintiff's disabilities and failed to engage in the interactive process. She is subject to the jurisdiction of this Court for acts committed in New York County in her individual capacity under color of law.

26.     Upon information and belief, Defendant Danté Browne is a resident of Michigan and, at all relevant times, served as Director of Human Resources for NDS Inc. Browne ordered and initiated the termination process, knowingly relied on false pretenses, and withheld grievance-related information. She is subject to the jurisdiction of this Court for acts committed in New York County in her individual capacity under color of law.

27.     Upon information and belief, Defendant Carolyn Klemens is a resident of New York and, at all relevant times, served as Human Resources Manager at NDS Harlem. Klemens willfully mischaracterized a PTSD-related disclosure as a workplace "threat" and failed to act on Plaintiff's discrimination complaint. She is subject to the jurisdiction of this Court for acts committed in New York County in her individual capacity under color of law.

28.     Upon information and belief, Defendant Matthew Knecht is a resident of New York and, at all relevant times, served as Chief of Counsel for NDS. Knecht obstructed the grievance process, denied accommodations, and made final determinations without regard to law or evidence. He is subject to the jurisdiction of this Court for acts committed in New York County in his individual capacity under color of law.

6

29.     Upon information and belief, Defendant Roxanna Gutierrez is a resident of New York and, at all relevant times, served as General Counsel for NDS Harlem. Gutierrez had knowledge of Plaintiff's discrimination and retaliation complaints but failed to intervene or stop the misconduct. She is subject to the jurisdiction of this Court for acts committed in New York County in her individual capacity under color of law.

30.     Upon information and belief, Defendant Piyali Basak is a resident of New York and, at all relevant times, served as Managing Director of NDS Harlem. Basak presided over Plaintiff's Step 2 Grievance Hearing, initially denied a recording accommodation, and imposed retaliatory conditions on its approval. She is subject to the jurisdiction of this Court for acts committed in New York County in her individual capacity under color of law.

31.     Upon information and belief, Defendant Shannon Anglero is a resident of New York and, at all relevant times, served as Deputy Executive Director of NDS Inc. Anglero participated in decisions affecting Plaintiff's accommodations and grievance access. She is subject to the jurisdiction of this Court for acts committed in New York County in her individual capacity under color of law.

32.     Upon information and belief, Defendant Rick Jones is a resident of New York and, at all relevant times, served as the Executive Director of Neighborhood Defender Service Inc. Plaintiff sent Jones a written letter dated July 10, 2025, outlining detailed allegations of disability discrimination, racial bias, and retaliation at NDS. Despite being placed on direct notice of these violations, Jones failed to respond, investigate, or take corrective action. Jones had the authority and responsibility to address these issues, and his inaction constitutes aiding, abetting, and failure to intervene in violation of the NYSHRL and NYCHRL. He is subject to the

jurisdiction of this Court for acts and omissions committed in New York County in his individual capacity.

33.     Plaintiff reserves the right to amend this Complaint to add additional individuals or entities revealed in discovery to have participated in or contributed to the unlawful acts described herein.

34.     References to "Neighborhood Defender Service," "Neighborhood Defender Service of Harlem," or "NDS" include all affiliated entities, agents, officers, supervisors, HR personnel, attorneys, or decision-makers acting under color of organizational authority and in concert with one another.

## FACTUAL ALLEGATIONS

### I. "This is not like the military, I'm trying to help you..."-Akbar

35.     Plaintiff Patrice Noel is a Black woman, U.S. Army veteran, and legal professional with over ten years of experience. She has been diagnosed with service-connected Post-Traumatic Stress Disorder (PTSD) and Attention Deficit Hyperactivity Disorder (ADHD), both qualifying disabilities under the ADA, the NYSHRL, and NYCHRL.

36.     In or around July 2024, NDS hired Plaintiff as a Litigation Assistant/Paralegal ("LA") in its Family Defense Practice at the Harlem office. Plaintiff was part of the very first cohort of six Litigation Assistants hired to inaugurate and shape this newly created role, making her not only an employee but also a participant in defining the position's structure and expectations.

37.     On July 2, 2024, following Plaintiff's second interview with Defendants Akbar and members of the FDP, Plaintiff sent a thank-you letter confirming her understanding of the

position's benefits and work environment as represented during the hiring process. (See attached as *Exhibit B*).

38.    In the letter, Plaintiff specifically referenced her excitement about "the benefits and opportunities at NDS" and described NDS as a "healthy and welcoming work environment," reflecting her reliance on Defendants' statements that the role included paid time off to study for the Uniform Bar Exam ("UBE"), disability-inclusive policies, and a trauma-informed supervisory approach.

39.    Plaintiff was assigned to Team Supervisor Armstrong and directly overseen by Supervisor Myranda Mendez, Deputy Practice Managing Attorney Schneider, and Practice Managing Attorney Akbar.

40.    Plaintiff initially received positive feedback regarding her communication and engagement. However, Armstrong soon began subjecting her to heightened micromanagement and scrutiny, soliciting performance commentary from junior attorneys, treatment not applied to other LAs by their supervisors.

41.    In or around September 2024, Plaintiff was informed she would receive a "two-month feedback meeting," which NDS claimed would be bilateral and was standard for all LAs. In truth, Defendants only arranged these meetings after Armstrong raised concerns about Plaintiff. They used the process to single her out under the guise of neutrality, retroactively framing it as routine.

42.    On or about October 11, 2024, based solely on Armstrong's unverified complaints, Akbar imposed a daily supervisory check-in structure on Plaintiff. No other Litigation Assistant was subjected to this level of intrusive oversight.

43.        Defendants imposed this structure without any individualized assessment, documentation of performance deficiencies, or opportunity for Plaintiff to self-correct.

44.        These adverse measures were rooted in biased perceptions of Plaintiff's identity as a disabled Black woman. Plaintiff was the only LA subjected to escalating scrutiny and ultimately terminated.

45.        On or about October 17, 2024, Plaintiff verbally disclosed to Akbar that the check-ins were exacerbating her PTSD symptoms and requested a trauma-informed alternative as a reasonable accommodation.

46.        Akbar stated that this wasn't like the military and summarily denied the request, failing to initiate the interactive process required under the ADA. She proposed no alternative and gave no legitimate justification for the continued imposition of the harmful structure.

47.        Plaintiff further explained that when her PTSD symptoms are triggered—particularly in a high-surveillance or overly controlled environment—they compound with her ADHD to cause cognitive overload. This dual activation impairs concentration, short-term memory, processing speed, and task sequencing, all of which are essential for managing complex legal matters, meeting deadlines, and ensuring accuracy.

48.        Plaintiff expressly warned Akbar that the daily check-ins would make her performance worse, as they heightened hypervigilance, disrupted focus, and eroded her ability to complete tasks efficiently. Rather than mitigate these effects through reasonable accommodations, Defendants continued the practice, causing the very performance issues they later used as a pretext for discipline.

49.     Mendez, who conducted the check-ins, knew they were causing harm but falsely reported to Akbar that they were "beneficial," despite no measurable improvement. She failed to advocate for Plaintiff or report the harm, violating her duties under NYCHRL § 8-107(13)(b).

50.     Between October 17, 2024 and November 25, 2024, Plaintiff's health and workplace performance deteriorated directly due to Defendants' refusal to provide timely and effective accommodations.

51.     On October 30, 2024, Plaintiff submitted a written accommodation request to Akbar, Mendez, and Schneider, proposing trauma-informed alternatives. Defendants ignored the request and failed to respond or engage in an individualized, good-faith dialogue as required by the ADA, NYSHRL, and NYCHRL.

52.     On October 31, 2024, Plaintiff emailed HR Manager Klemens requesting a meeting to discuss accommodations, medical leave, and concerns about Akbar's discriminatory treatment. Klemens met with Plaintiff the following day, November 1, 2024.

53.     On November 6, 2024, Klemens demanded Plaintiff submit her accommodation request in writing with supporting medical documentation. She refused to implement interim accommodations. She also denied Plaintiff's request to combine disability leave with bar exam study leave, claiming the benefit did not apply to LAs.

54.     That same day NDS held a training on trauma, boundaries, and wellness led by supervising social worker Dori Brail. Before the session, Plaintiff confided in Brail about the discriminatory supervision she was experiencing under Akbar. Although she had not planned to disclose her PTSD diagnosis, the severity of her distress compelled her to do so. Brail, the only licensed social worker in the FDP, listened attentively. Social Work Supervisor Helen Moltavan was also present and overheard the disclosure.

55.        Plaintiff explained to Brail and Moltavan that the supervision structure was discriminatory and worsening her trauma symptoms. Both acknowledged her concerns and attempted to assist—Brail recommending that her therapist document the cognitive effects of trauma triggers and introducing the "fight, flight, or freeze" framework as a way to describe them. Neither is named as a defendant because they listened and sought to help, NDS later prohibited them from testifying and instead weaponized the very framework Brail shared, using it to justify Plaintiff's suspension.

## II. "It seems like you want special privileges." - Klemens

56.        On November 18, 2024, following union guidance and in consultation with Akbar, Plaintiff submitted a comprehensive, four-page self-directed performance improvement plan to Akbar, Mendez, and Schneider. Defendants ignored it and offered no feedback.

57.        That same day, Plaintiff sent Klemens a letter from her treating therapist, with a more detailed recommendation to follow. She reiterated that the check-in structure aggravated her PTSD and requested an update on her leave request and accommodations.

58.        Later that evening, Plaintiff emailed Klemens a second letter from her provider, which included specific accommodation recommendations. She asked for a timely response and guidance on implementation.

59.        On November 19, 2024, Klemens acknowledged receipt but said she was prioritizing payroll and would respond by the end of the week. She asked Plaintiff to confirm whether the daily check-ins were still ongoing.

60.        Plaintiff confirmed that they were. On November 21, she met with Klemens and HR Director Browne. Though they acknowledged her requests, they took no immediate action.

61.      Plaintiff reported Armstrong's racial bias to Browne and HR. Defendants ignored the complaint. Plaintiff also tried to report Akbar's disability-related misconduct, but Klemens took no action. Akbar and Klemens instead reframed Plaintiff's trauma responses as character flaws.

62.      On November 25, 2024—six weeks after her initial request and one week after her therapist's formal submission—NDS approved Plaintiff's accommodation request. However, the harm had already occurred.

63.      That same day, Akbar emailed Plaintiff confirming her accommodations, including reduced supervisory check-ins. However, Akbar also stated that weekly check-ins with Mendez would begin that week and requested to schedule a disciplinary meeting with HR present. She acknowledged Plaintiff's right to union representation and confirmed the disciplinary nature of the meeting.

64.      Plaintiff responded that she was unwell and requested a list of alleged deficiencies, and requested Armstrong be a part of the conversation.

65.      Akbar confirmed the meeting was disciplinary but refused to provide any supporting documentation. Mendez and Schneider, copied on the email, remained silent.

66.      On November 26, 2024, with Klemens now copied on the same thread, Plaintiff informed Akbar that her union representative was unavailable and asked to reschedule. She also requested to conduct intake remotely due to PTSD symptoms triggered by Armstrong's presence.

67.      Akbar denied the remote work request, claiming intake must be performed in person. Plaintiff explained that the request fell within her flexible scheduling accommodation and was necessary to manage trauma symptoms.

68.        Plaintiff emphasized that LAs had previously performed intake remotely and that the role was newly created with flexible functions.

69.        Due to Akbar's denial of accommodations, Klemens and Browne met with Plaintiff to go over what accommodations had already been granted. She requested union representation knowing the potential for escalation due to the prolonged denial and discrimination, but Klemens denied the request without reason.

70.        During the meeting, Plaintiff described the "fight, flight, or freeze" trauma response and explained how Armstrong's presence *could* trigger a reaction. Klemens mischaracterized this as a threat.

71.        Plaintiff immediately clarified that she was describing a medically recognized symptom of PTSD, not making a threat. Klemens refused to accept the clarification. When asked whether she perceived a threat, Browne declined to respond and proposed reconvening the next day.

72.        That evening, Defendants locked Plaintiff out of her work systems and emailed her a suspension notice. The notice cited her PTSD-related disclosure as the basis for suspension, reframing her protected disclosure as a workplace threat.

73.        The suspension occurred one day after NDS approved her accommodation request and while her STD application was still pending. The timing and rationale reflect unlawful retaliation and disability discrimination under applicable law.

74.        The notice did not cite any actual misconduct, nor did it reference possible termination. Defendants' concealment deprived Plaintiff of her due process rights under the Collective Bargaining Agreement (CBA) and denied her union the opportunity to grieve the suspension.

14

75.     During Plaintiff's suspension, Akbar communicated with the union regarding Plaintiff's return. However, on December 12, 2024, fifteen minutes after Akbar's email, HR converted the suspension to a termination without further process or notice.

### III. "NDS approved Ms. Noel's sole written request for disability accommodations."

76.     Plaintiff attempted to assert her rights through NDS's grievance process, but Defendants weaponized the procedure against her. Knecht, Basak, and Anglero imposed retaliatory restrictions—banning recordings, excluding Plaintiff's chosen union representatives, and refusing to remove conflicted HR personnel such as Klemens.

77.     Knecht falsely claimed that NDS had "no obligation" to investigate the "threat" allegation, despite contemporaneous evidence, including guidance from the Job Accommodation Network and procedure outlined in NDS Employee Handbook. (See *Exhibit C*- NDS' 5/21/25 Response to the Union).

78.     Akbar and Knecht deliberately withheld critical testimony from social workers Dori Brail and Helen Moltavan, even instructing staff not to cooperate—conduct in direct violation of NYCHRL § 8-107(13)(b), which requires employers to take steps to prevent and remedy discrimination.

79.     Instead, on June 27, 2025, Knecht issued the Step 2 grievance decision, rehashing dead arguments and stating: "NDS did not engage in discrimination based on disability. NDS approved Ms. Noel's sole written request for disability accommodations." (*Exhibit D*- Step 2 grievance decision)

80.     Meanwhile, Akbar and Klemens spread false claims that Plaintiff was unprofessional, emotionally unstable, or a safety threat. These defamatory statements were

circulated internally, externally, and to union members, severely harming Plaintiff's reputation and career prospects.

81.     Knecht and Anglero reinforced this false narrative by denying Plaintiff documentation, blocking investigation, and repeatedly framing her protected disclosures as "threatening."

82.     The grievance process, which extended well into 2025, functioned as a tool to obstruct Plaintiff's claims, silence her advocacy, and prolong the psychological harm. Knecht and Basak ignored her written accommodation requests, denied procedural rights, and enforced retaliatory conditions in violation of the ADA.

83.     Anglero and Knecht further upheld discriminatory procedures by initially refusing to remove conflicted HR staff.

84.     On July 10, 2025, Plaintiff sent a detailed letter to Executive Director Rick Jones and the NDS Board of Directors outlining the systemic failures of the grievance process, the mischaracterization of her PTSD disclosure as a "threat," and the racialized framing of her conduct.

85.     Plaintiff warned that NDS's treatment of her reflected broader ableist and anti-Black cultural failures affecting both staff and clients. Despite this notice, Jones and the Board took no action—further evidencing their ratification of discriminatory conduct and indifference to Plaintiff's rights.

86.     As a direct result of Defendants' conduct, Plaintiff lost her job, housing, health insurance, bar exam study leave, and the opportunity to sit for the bar exam. She experienced a severe psychological crisis requiring a 28-day stabilization program, new psychiatric medication, and long-term reliance on a service dog.

87.    Defendants knew of Plaintiff's disabilities, her bar exam goals, and her history of academic struggles. Yet they acted with deliberate disregard, obstructing her recovery and professional advancement.

88.    Defendants compounded the harm by spreading stigmatizing, false claims of insubordination, "special privileges," and instability—eroding peer support and deepening the hostile environment post termination.

89.    All Defendants had actual or constructive knowledge of Plaintiff's disabilities, complaints, and accommodation requests. Yet they coordinated to eliminate her, suppress evidence, and discredit her.

90.    NDS also refused to forward Plaintiff's legal demand letters directed to Mendez and Browne, further obstructing resolution.

91.    As a result of Defendants' conduct, Plaintiff asserts claims under the ADA, Title VII, NYSHRL, NYCHRL, and common law as outlined in the below causes of action.

### FIRST CAUSE OF ACTION
*Disability Discrimination and Failure to Accommodate*
**(Title I of the ADA, 42 U.S.C. § 12112; NYSHRL, N.Y. Exec. Law § 296; NYCHRL, N.Y.C. Admin. Code § 8-107)**
**(Against Defendant NDS Inc. and Individual Defendants)**

93.    Plaintiff realleges and incorporates all preceding paragraphs. At all relevant times, Defendants had actual knowledge of Plaintiff's qualifying disabilities.

94.    Despite this knowledge, Defendants discriminated against Plaintiff and failed to provide reasonable accommodations by imposing a medically contraindicated daily check-in structure, refusing to engage in the interactive process, delaying and denying requested accommodations, mischaracterizing PTSD-related disclosures as threats, and terminating

17

Plaintiff before she could benefit from approved accommodations (See *Exhibit E*- November 26 Email Thread, accommodation request that led to termination).

95.      Plaintiff was treated less favorably than non-disabled employees and subjected to heightened scrutiny, disparate discipline, and adverse employment actions based on disability-related symptoms and stereotypes.

96.      Each individual Defendant named herein personally participated in, directed, or knowingly permitted the discriminatory conduct described above.

97.      Defendants' conduct was willful, malicious, and in reckless disregard of Plaintiff's rights under federal, state, and city law, causing severe professional, emotional, psychological, and financial harm.

98.      Plaintiff seeks all remedies available under applicable law, as set forth in the Prayer for Relief.

## SECOND CAUSE OF ACTION
### Retaliation and Interference Based on Disability
**(ADA, 42 U.S.C. § 12203; NYSHRL § 296(7); NYCHRL § 8-107(7))**
**(Against Defendant NDS, Inc. and Individual Defendants Akbar, Klemens, Knecht, Browne, Basak, Anglero, Mendez, and Jones)**

99.      Plaintiff realleges and incorporates all preceding paragraphs.

100.      Plaintiff engaged in protected activity by requesting reasonable accommodations, disclosing the effects of her dissabilites, and opposing supervision practices that aggravated her conditions.

101.      In retaliation, Defendants: denied accommodations; suspended Plaintiff one day after approving her formal ADA request; mischaracterized a protected disability-related disclosure as a "threat"; terminated her before accommodations could be implemented; obstructed the grievance process; and suppressed favorable witness participation. Post-

termination, Defendants further interfered by conditioning accommodations on surrendering union rights, restricting access to grievance records, and reframing medical disclosures as misconduct. (See attached Suspension Notice dated 11/26/25 as *Exhibit F.*)

102.     The individual Defendants named above directly participated in, or knowingly facilitated, these actions with the intent to punish and deter Plaintiff from exercising her rights under disability law.

103.     As a result, Plaintiff suffered significant economic loss, reputational harm, emotional distress, and disruption of medical care. Plaintiff seeks all remedies available under applicable law, as set forth in the Prayer for Relief.

**THIRD CAUSE OF ACTION**
**Race Discrimination – Title VII, NYSHRL, and NYCHRL**
**(Against Defendant NDS Inc. and Individual Defendants Akbar, Klemens, Basak, Browne, Anglero, Knecht and Jones under NYSHRL and NYCHRL)**

104.     Plaintiff realleges and incorporates all preceding paragraphs.

105.     Plaintiff is a Black woman with service-connected PTSD and ADHD, placing her at the intersection of multiple protected classes under applicable law.

106.     Defendants, through supervisory, HR, and leadership personnel, subjected Plaintiff to racially discriminatory treatment, including unequal scrutiny, distorted interpretations of her conduct, and adverse actions not imposed on similarly situated non-Black employees.

107.     Racial stereotypes, particularly the trope of the "angry" or "unstable" Black woman, shaped how Plaintiff's trauma disclosures were received and how her accommodation requests were evaluated.

108.    Management credited biased accounts from white staff over Plaintiff's explanations and medical documentation, cast her as a workplace "threat," and used that narrative to justify her suspension and termination (*Exhibit F*).

109.    These acts violated Title VII and constitute unlawful discrimination under NYSHRL and NYCHRL, which prohibit both direct and indirect race-based mistreatment in employment. Individual Defendants are liable under N.Y. Exec. Law § 296(6) and N.Y.C. Admin. Code § 8-107(6) for aiding, abetting, or failing to remedy the discrimination.

110.    Plaintiff suffered economic, reputational, emotional, and professional harm, and seeks all remedies available under applicable law, as set forth in the Prayer for Relief.

## FOURTH CAUSE OF ACTION
### Hostile Work Environment – Title VII, ADA, NYSHRL, and NYCHRL
### (Against NDS Inc. and Individual Defendants under NYSHRL and NYCHRL)

111.    Plaintiff realleges and incorporates all preceding paragraphs.

112.    Defendants created and perpetuated a hostile work environment based on Plaintiff's race and disabilities, in violation of applicable law. This included heightened scrutiny, disparate discipline, exclusion from workplace processes, and the use of racial stereotypes and disability stigma to justify adverse actions. Most importantly, defendants, exacerbated plaintiffs PTSD by refusing to accommodate for over 6 weeks. (See *Exhibit E*).

113.    The hostile environment continued after termination[1], including obstruction of the grievance process, suppression of favorable witness participation, and repeated framing of disability-related disclosures in a defamatory manner. (See *Exhibit G, Exhibit H* – Post-

---

[1] Post-employment retaliation is actionable when tied to the prior employment relationship. *See Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997); *Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 89 (2d Cir. 2010).

termination grievance correspondence showing suppression of supportive testimony and continued defamatory statements).

114.    The conduct described herein was carried out with the knowledge, participation, or approval of the individual defendants who either directly engaged in the behavior or failed to take corrective action, despite having authority to do so.

115.    Defendants' actions were intentional, pervasive, and in reckless disregard of Plaintiff's rights under applicable law, causing lasting professional, reputational, emotional, and financial harm.

116.    Plaintiff seeks all remedies available under applicable law, as set forth in the Prayer for Relief.

## FIFTH CAUSE OF ACTION
### Disparate Discipline and Termination – Title VII, ADA, NYSHRL, and NYCHRL
### (Against NDS Inc. and Individual Defendants Akbar, Klemens, Knecht, Basak, Browne, Schneider, Anglero, Mendez, Gutierrez and Jones)

118.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

119.    Defendants disciplined and terminated Plaintiff because of her race, disabilities, and protected activity, in violation of Title VII, the ADA, the NYSHRL, and the NYCHRL.

120.    Defendants bypassed standard performance-improvement measures and escalated directly to termination, while similarly situated non-Black, non-disabled employees with equal or greater deficiencies received informal resolution or direct accommodations without HR involvement or medical documentation.

121.    Other LAs experienced the same comprehension and task-completion issues attributed to Plaintiff but were not subjected to heightened scrutiny.

122.     A separate employee made an actual workplace "threat" in jest yet faced no comparable treatment or termination. The disparate response to Plaintiff's protected PTSD-related disclosure—mischaracterized as a "threat"—demonstrates selective enforcement and pretext. (See *Exhibit I* – screenshot evidence of Akbar confirming desperate response).

123.     Following Plaintiff's termination, NDS materially altered the Litigation Assistant role by assigning a dedicated supervisor and substantially revising duties, which not only confirmed the role could have been restructured to avoid the alleged performance issues, but also implicitly acknowledged significant flaws in the supervisory structure under which Plaintiff was required to work.

124.     Each named Individual Defendant participated in, approved, or failed to prevent these actions despite knowing Plaintiff's protected status and the discriminatory, retaliatory nature of the discipline.

125.     Defendants' conduct was motivated, at least in part, by racial and disability bias, and retaliatory animus toward Plaintiff's accommodation requests and internal complaints, causing lasting professional, emotional, and financial harm.

126.     Plaintiff seeks all remedies available under applicable law, as set forth in the Prayer for Relief.

### SIXTH CAUSE OF ACTION
### Race-Based Retaliation
**(Title VII, 42 U.S.C. § 2000e-3; NYSHRL § 296(7); NYCHRL § 8-107(7))**
**(Against Defendant NDS Inc. and Individual Defendants Akbar, Schneider, Klemens, Browne, Knecht, Gutierrez, Basak, and Anglero and Jones)**

127.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

128.     Plaintiff engaged in protected activity by complaining internally about race-based bias, including being subjected to disparate standards and credibility determinations as a Black woman.

129.     She reported to HR that Akbar uncritically accepted Armstrong's negative account over Plaintiff's own explanation, and that Armstrong altered her communication style with Plaintiff out of discomfort—behavior not directed toward white or non-Black junior staff—facts documented in writing or witnessed by staff and union members.

130.     Defendants ignored these complaints, further manipulated supervision, suspension, and grievance procedures to punish Plaintiff for raising race-related concerns, with full awareness that such actions would compound her prior experiences of racial trauma.

131.     The proximity of these actions to Plaintiff's complaints, and their selective nature, support a clear inference of retaliatory motive.

132.     Defendants' conduct violated Title VII, the NYSHRL, and the NYCHRL, each of which prohibits retaliation for opposing race discrimination.

133.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered economic losses, reputational harm, emotional distress, and disruption of medical care."

134.     Plaintiff seeks all remedies available under applicable law, as set forth in the Prayer for Relief.

## SEVENTH CAUSE OF ACTION
### Race Discrimination – 42 U.S.C. § 1981
### (Against NDS Inc. and Defendants Akbar, Schneider, Klemens, Browne, Knecht, Gutierrez, Basak, Anglero and Jones)

135.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

136.    Under 42 U.S.C. § 1981, all persons are entitled to the full and equal benefit of contractual relationships without regard to race.

137.    Plaintiff, a Black woman, was denied the same contractual rights and conditions of employment as her non-Black peers, including fair evaluation, continued employment, and equal access to grievance protections.

138.    Defendants relied on racialized characterizations and stereyotypes such as "threatening" and "insubordinate" to justify their abuse, despite a lack of objective performance deficiencies.

139.    Individual Defendants named herein participated by enforcing racially motivated discipline, suppressing exculpatory information, or endorsing false narratives to justify Plaintiff's removal.

140.    These actions were intentional, racially motivated, and directly interfered with Plaintiff's contractual rights in violation of § 1981.

141.    Plaintiff seeks all remedies available under applicable law, as set forth in the Prayer for Relief.

## EIGHTH CAUSE OF ACTION
### Civil Rights Conspiracy – 42 U.S.C. § 1985(3)
### (Against NDS Inc. and Individual Defendants Akbar, Klemens, Browne, Knecht, Basak, Anglero, Schneider, Gutierrez, Mendez and Jones)

142.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

143.    Under 42 U.S.C. § 1985(3), it is unlawful for two or more persons to conspire to deprive another of the equal protection of the laws or of equal privileges and immunities under the laws.

144.     Defendants, acting individually and through their roles within NDS, entered into an agreement, express or tacit, to discriminate and retaliate against Plaintiff on the basis of race and disability.

145.     In furtherance of this agreement, Defendants engaged in coordinated acts, including but not limited to (a) Implementing a medically contraindicated surveillance structure immediately after Plaintiff requested trauma-informed supervision; (b) Circulating suspension materials with mischaracterizations of Plaintiff's disability-related disclosure as a workplace "threat" despite clarifying evidence and medical documentation; (c) Obstructing due process during the grievance process as witnessed by multiple staff and union members; (d) Maintaining defamatory narratives despite contrary evidence; (e) Crediting biased statements from white supervisors while disregarding Plaintiff's account and failing to conduct a neutral investigation. (*Exhibit C*)

146.     These acts were executed across HR (Klemens, Browne), legal (Knecht, Gutierrez), senior management (Akbar, Basak), and executive leadership (Anglero and Jones), reflecting a unified plan of action outside the protection of the intracorporate conspiracy doctrine. Plaintiff's July 10, 2025 letter placed Jones on direct notice of these violations, and his failure to respond or intervene ratified and furthered the conspiracy.[2]

147.     NDS Inc. ratified and participated in this conspiracy by authorizing, condoning, and executing these coordinated acts.

---

[2] See *Webb v. Goord*, 340 F.3d 105, 111 (2d Cir. 2003) (recognizing that where alleged conspirators operate across different departments or functional divisions, and coordinate to achieve an unlawful objective, the intracorporate conspiracy doctrine does not bar a § 1985(3) claim).

148.     Defendants acted with discriminatory animus toward Plaintiff as a disabled Black woman, with the intent to discredit, isolate, and remove her for asserting legal rights and reporting civil rights violations.

149.     As a result, Plaintiff was deprived of rights under the ADA, Title VII, and 42 U.S.C. § 1981, including the right to equal treatment in employment, freedom from retaliation, and due process in disciplinary and grievance proceedings.

150.     Defendants' conduct was intentional, malicious, and in reckless disregard of Plaintiff's federally protected rights.

151.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered economic losses, reputational harm, emotional distress, and disruption of medical care."

152.     Plaintiff seeks all remedies available under applicable law, as set forth in the Prayer for Relief.

### NINTH CAUSE OF ACTION
**"Regarded As" Disability Discrimination**
**(ADA, 42 U.S.C. § 12102(3); NYSHRL § 296; NYCHRL § 8-107)**
**(Against Defendants NDS Inc., and Individual Defendants)**

153.     Plaintiff realleges and incorporates all preceding paragraphs.

154.     The ADA, NYSHRL, and NYCHRL prohibit discrimination against an employee perceived as having a physical or mental impairment, whether or not that impairment substantially limits a major life activity.

155.     Defendants regarded Plaintiff as unstable or unfit based on perceived symptoms of PTSD and ADHD, including difficulty with multi-step tasks, sensitivity to micromanagement.

156.     Internal communications and disciplinary records mischaracterized disability-related behavior as misconduct, labeling Plaintiff "distracted," "unfocused," or "noncompliant,"

and suggesting that she could harm client matters due to alleged delays. These conclusions ignored contemporaneous explanations and evidence.

157.    Defendants' actions, grounded in stigma and unfounded assumptions rather than individualized assessment, constitute unlawful adverse action under the ADA, NYSHRL, and NYCHRL.

158.    Plaintiff seeks all available remedies under applicable law, as set forth in the Prayer for Relief.

## TENTH CAUSE OF ACTION
### Constructive Discharge Based on Disability, Race, and Gender
### (In Violation of the ADA, Title VII, NYSHRL, and NYCHRL)
### (Against Defendants NDS Inc. and Individual Defendant's )

159.    Plaintiff realleges and incorporates the preceding paragraphs.

160.    Plaintiff, a Black woman with PTSD and ADHD, endured escalating discriminatory and retaliatory conduct, including a medically harmful daily "check-in" regime, repeated denials of accommodation requests, and racially biased assumptions of instability and insubordination.

161.    On October 30 and November 18, 2024, Plaintiff warned management in writing that these measures were causing "grave and potentially irreparable" harm. Defendants ignored these warnings. (*Exhibit J*- Plaintiffs written pleas for trauma informed supervision)

162.    The suspension, coming after months of unaddressed mistreatment, was the tipping point that forced Plaintiff into an emotional crisis center. At that point, the conditions had become so intolerable that any reasonable person in her position would feel compelled to leave.

163.     Each individually named Defendant had direct knowledge of Plaintiff's disabilities, warnings of harm, and requests for accommodations, yet participated in or failed to stop the conduct, incurring liability under NYSHRL § 296(6) and NYCHRL § 8-107(6).

164.     Post-termination, Defendants Anglero, Knecht, Schneider, and Gutierrez further perpetuated the harm by obstructing the grievance process despite knowing the underlying discriminatory and retaliatory conduct.

165.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered economic losses, reputational harm, emotional distress, and disruption of medical care.

166.     Plaintiff seeks all available remedies under applicable law, as set forth in the Prayer for Relief.

## ELEVENTH CAUSE OF ACTION
### Failure to Prevent Discrimination and Retaliation
**(NYSHRL, N.Y. Exec. Law § 296(6); NYCHRL, N.Y.C. Admin. Code § 8-107(13))**
**(Against Defendant NDS, Inc.)**

167.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

168.     Under NYSHRL and NYCHRL, employers are liable for failing to take reasonable steps to prevent and remedy known discrimination and retaliation.

169.     Defendant NDS had actual and constructive notice of race- and disability-based discrimination and retaliation directed at Plaintiff, through her repeated complaints, supporting documentation, and corroboration from union representatives.

170.     Despite this notice, NDS failed to conduct an adequate investigation, intervene in supervisory abuse, or discipline responsible staff.

171.     This failure enabled ongoing unlawful conduct, culminating in Plaintiff's constructive discharge. As a direct and proximate result of Defendant's unlawful conduct,

Plaintiff has suffered economic losses, reputational harm, emotional distress, and disruption of medical care.

172. Plaintiff seeks all available remedies under applicable law, as set forth in the Prayer for Relief.

### TWELFTH CAUSE OF ACTION
### Negligent Supervision and Retention
### (Against Defendant NDS, Inc.)

173. Plaintiff realleges and incorporates by reference all preceding paragraphs.

174. Under New York law, employers are liable for negligent supervision and retention where they knew or should have known of an employee's propensity for unlawful conduct.

175. NDS had actual and constructive notice that supervisors and executives engaged in discriminatory and retaliatory acts toward Plaintiff during and after her employment.

176. Despite internal complaints, corroborating witnesses, and post-termination disclosures to senior leadership, NDS failed to investigate, discipline, or remove those responsible.

177. This inaction enabled further harm and constituted negligent supervision and retention. As a direct result, Plaintiff suffered emotional, reputational, and economic harm.

178. Plaintiff seeks all available remedies under applicable law, as set forth in the Prayer for Relief.

### THIRTEENTH CAUSE OF ACTION
### Intentional or Negligent Infliction of Emotional Distress
### *(Under New York Common Law – Pled in the Alternative)*
### (Against Defendants NDS Inc., and Individual Defendants)

179. Plaintiff realleges and incorporates by reference all preceding paragraphs.

29

180.    Defendants were on repeated written and verbal notice of Plaintiff's trauma history and the severe emotional risks posed by their supervisory tactics. Despite this, they engaged in or permitted a sustained pattern of hostile, discriminatory, and retaliatory treatment.

181.    As a direct result, Plaintiff suffered severe psychological trauma, culminating in a 28-day admission to a licensed emotional crisis center immediately following her suspension. She began a new medication regimen and now requires the assistance of a trained psychiatric service animal.

182.    The harm extended beyond work, causing withdrawal from family and social relationships, inability to attend cultural events, and ongoing PTSD exacerbation that has diminished her quality of life.

183.    Plaintiff warned Defendants in writing that the harm she faced would be "grave and irreparable." Nonetheless, they persisted, as documented by emails, screenshots, videos, and communications with medical providers.

184.    On May 30, 2025, during the grievance process, Plaintiff wrote to Defendant Anglero (copying other Individual Defendants) stating: "The continued denial, delay, and uncertainty is significantly exacerbating my PTSD symptoms." Defendants prolonged the process and ultimately issued a discriminatory decision, compounding the harm.

185.    Defendants' conduct was extreme and outrageous, undertaken with knowledge of Plaintiff's vulnerabilities, satisfying the elements for Intentional Infliction of Emotional Distress. Alternatively, their reckless disregard for the foreseeable risk of harm supports liability for Negligent Infliction of Emotional Distress.

186.    As a proximate result, Plaintiff continues to suffer PTSD regression, emotional pain, reputational damage, and disruption to her career and personal well-being.

187.    Plaintiff seeks all available remedies under applicable law, as set forth in the

Prayer for Relief.

## FOURTEENTH CAUSE OF ACTION
### Defamation – Disability and Professional Misconduct Falsehoods
### (Against NDS Inc., Akbar, Klemens, Browne, Knecht, and Basak)
### (Under New York Common Law)

188.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

189.    Under New York law, a defendant is liable for defamation when they publish a

false statement of fact to a third party, without privilege, that exposes the plaintiff to public

contempt or professional harm. This includes *defamation per se* where the statements attack the

plaintiff's competence or fitness in her profession.[3]

190.    Defendants knowingly published false and stigmatizing statements about Plaintiff,

including that she was a "safety threat," "unstable," "insubordinate," and was terminated due to

misconduct.

191.    The statements impugned Plaintiff's professionalism and fitness as a legal

advocate and were made with actual malice or reckless disregard for the truth, without any

applicable privilege,[4] given their circulation to individuals with no legitimate need to know and

outside the confines of any good-faith investigative or adjudicative process.

192.    Multiple current employees who had no role in Plaintiff's supervision, HR

matters, or the grievance process became aware of the "threat" allegation and purported

---

[3] *See Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992) (statements that tend to disparage a person in her profession are defamatory per se); *see also Thomas v. City of New York*, 2019 WL 1428433, at *7 (S.D.N.Y. Mar. 29, 2019). *Dillon v. City of New York*, 261 A.D.2d 34, 38 (1st Dep't 1999) (statements that impugn the integrity or competence of an employee in their profession are defamatory per se)

[4] In New York, statements made during EEOC proceedings or internal investigations may be conditionally privileged, but only if made in good faith to individuals with a legitimate need to know. *See Liberman v. Gelstein*, 80 N.Y.2d 429, 437–38 (1992). Circulating such statements to co-workers or third parties outside the legitimate process removes the privilege and makes them actionable.

performance deficiencies. On information and belief, this knowledge resulted from Defendants'

republication of these false statements outside any privileged context, in violation of the

conditional "need-to-know" limitation on internal employment communications.

193.    The "safety threat" label, in particular, was based on a protected PTSD disclosure

and was knowingly mischaracterized by Defendants, including Browne, in written suspension

and termination communications.

194.    These statements impugned Plaintiff's professionalism and fitness as a legal

advocate and were made with actual malice or reckless disregard for the truth. The dissemination

of such statements beyond those with a legitimate business need-to-know further defeats any

claim of conditional privilege.

195.    As a direct and proximate result, Plaintiff suffered reputational injury,

professional exclusion, emotional harm, and loss of career opportunities.

196.    Plaintiff seeks all available remedies under applicable law, as set forth in the

Prayer for Relief.

## FIFTEENTH CAUSE OF ACTION
### *Tortious Interference with Prospective Economic Advantage*
### (Against Defendants NDS Inc., Akbar, Browne, Klemens, and Basak)

197.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

198.    Plaintiff had a concrete and reasonable expectancy in sitting for the Unified Bar

Exam, obtaining licensure, and advancing in her legal career—a goal known to Defendants

through onboarding discussions, leave requests, and direct disclosures of her preparation plans.

199.    With this knowledge, Defendants acted in bad faith and outside any legitimate

business purpose by imposing a destabilizing supervision plan, mischaracterizing disability-

related conduct, and terminating Plaintiff under pretext, knowing such actions would impair her exam readiness.

200.    As a foreseeable result, Plaintiff's mental health destabilized in late 2024, forcing her to miss the February 2025 exam. Defendants compounded the harm post-termination by prolonging the grievance process, despite explicit written notice on May 30, 2025, that the delay was exacerbating her PTSD symptoms.

201.    The prolonged uncertainty prevented Plaintiff from sitting for the July 2025 exam, causing her to miss two consecutive testing cycles, delaying entry into the legal profession, and worsening financial instability, housing insecurity, reputational harm, and emotional distress. [5]

202.    Defendants' conduct was intentional, retaliatory, and without justification, undertaken with knowledge of the harm it would cause.

203.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered economic losses, reputational harm, emotional distress, and disruption of medical care.

204.    Plaintiff seeks all available remedies under applicable law, as set forth in the Prayer for Relief.

## SIXTEENTH CAUSE OF ACTION
### Fraudulent Misrepresentation
### (Under New York Common Law – Against Defendants NDS Inc., Akbar, Schneider, Klemens, and Browne)

205.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

---

[5] In *Shah v. Wilco Sys., Inc.*, 27 A.D.3d 169, 176 (1st Dep't 2005), the court held that a plaintiff stated a claim for tortious interference with prospective economic advantage where the defendant's retaliatory actions destroyed the plaintiff's opportunity to obtain a specific employment position, recognizing that interference motivated by discrimination or retaliation may constitute "wrongful means."

206.     Under New York law, a claim for fraudulent misrepresentation requires: (1) a material misrepresentation of fact; (2) made with knowledge of its falsity; (3) with the intent to induce reliance; (4) justifiable reliance by the plaintiff; and (5) resulting damages.

207.     During Plaintiff's recruitment and onboarding, Defendants Akbar and Schneider represented that NDS valued lived experience, championed disability inclusion, and would provide accommodations and flexibility to support Plaintiff's bar exam preparation and mental health needs. These assurances included a specific benefit of paid time off to study for the Uniform Bar Exam ("UBE"), which Defendants described as available to her position. These representations were reinforced verbally during interviews and in training.

208.     Plaintiff accepted employment, foregoing other viable opportunities, in reliance on these assurances and the belief that NDS offered a stable, trauma-informed environment. This reliance is reflected in Plaintiff's post-interview thank-you letter to Defendants (*Exhibit B*), in which she confirmed her understanding that NDS was a "healthy and welcoming work environment" and that she was particularly interested in the "benefits and opportunities" discussed during the hiring process.

209.     In truth, Defendants knew or should have known that the paid study leave benefit was not applicable to Plaintiff's position and that the environment would not align with the representations made. Plaintiff was informed of the inapplicability of the paid study leave only after she had begun her employment, negating the number one benefit that had induced her to accept the offer. (See *Exhibit K* -email correspondence with Klemens regarding non-applicability to LA position.)

210.     As set forth in the preceding causes of action, once Plaintiff asserted her rights and requested accommodations, Defendants engaged in conduct directly contrary to their

representations, including retaliatory and discriminatory actions that undermined her ability to prepare for the UBE and maintain stable employment.

211.    Plaintiff's reliance on Defendants' assurances was reasonable and foreseeable. Had she known the truth, she would have declined the offer or remained an independent contractor.

212.    As a direct and proximate result, Plaintiff suffered financial loss, emotional harm, reputational injury, and at least a year's delay in entering the legal profession due to missed bar exam cycles.

213.    Plaintiff seeks all available remedies under applicable law, as set forth in the Prayer for Relief.

### SEVENTEENTH CAUSE OF ACTION
**Promissory Estoppel**
**(Pled in the Alternative to Fraudulent Misrepresentation)**
**(Against Defendants NDS Inc., Akbar, Klemens, and Browne)**

214.    Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

215.    In the alternative to fraudulent misrepresentation, Plaintiff alleges promissory estoppel.

216.    Under New York law, promissory estoppel requires: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance; and (3) resulting injury.

217.    As detailed above, Defendants promised Plaintiff paid bar study leave, disability accommodations, and a supportive, trauma-informed work environment.

218.    Plaintiff reasonably relied on these assurances by accepting the position, foregoing other opportunities, and disclosing sensitive disability information.

219.     As set forth in prior causes of action, Defendants failed to honor these promises, creating conditions that prevented Plaintiff from sitting for two bar exams and advancing her legal career.

220.     Plaintiff suffered delayed licensure, lost income, unstable housing, emotional distress, and reputational harm.

221.     In equity and good conscience, Defendants should be estopped from denying the promises made and the foreseeable harm caused.[6]

## EIGHTEENTH CAUSE OF ACTION
### Prima Facie Tort
### (Against Defendants NDS, Inc., Akbar, Browne, Knecht, Klemens, Basak, and Anglero)

222.     Plaintiff realleges and incorporates by reference all preceding paragraphs, including those detailing Defendants' retaliatory and discriminatory acts (see, ¶¶ 101).

223.     Acting without legitimate business purpose, Defendants intentionally engaged in otherwise lawful acts solely to cause harm to Plaintiff.

224.     As previously set forth, Akbar and Klemens advanced the "threat" pretext; Browne withheld key grievance documents; Knecht and Anglero imposed restrictive grievance procedures; and Basak added retaliatory hurdles to ADA accommodations.

225.     Defendants' coordinated conduct was aimed at isolating Plaintiff, destroying her professional reputation, and derailing her legal career.

---

[6] See *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (recognizing promissory estoppel & emphasizing that the doctrine prevents injustice when the promisor's conduct foreseeably and detrimentally alters the promisee's position). Here, Defendants' assurances of bar study leave and disability support induced Plaintiff to accept employment, and their reversal caused direct professional and financial harm.

226.     As a direct result, Plaintiff suffered special damages, including loss of bar licensure opportunities, emergency mental health costs, lost income and housing stability, reputational injury, and prolonged career disruption.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants, jointly and severally, as follows:

A. **Compensatory damages** for past and future emotional distress, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation.

B. **Economic damages** for past and future lost wages, lost benefits, loss of earning capacity, and other economic losses resulting from Defendants' conduct.

C. **Punitive damages** to punish Defendants for their willful, malicious, and reckless conduct and to deter similar misconduct in the future.

D. **Statutory damages** as provided under the ADA, Title VII, NYSHRL, NYCHRL, and other applicable laws.

E. **Injunctive and declaratory relief** requiring Defendants to cease their unlawful practices, expunge adverse records, and implement policies and training to prevent future discrimination and retaliation.

F. **Attorneys' fees and costs** pursuant to the ADA, Title VII, NYSHRL, NYCHRL, and other applicable statutes.

G. **Pre- and post-judgment interest** as allowed by law.

H. **Such other and further relief** as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: New York, New York
August 22, 2025

Respectfully submitted,

Patrice Noel
Plaintiff, Pro Se
14 Knolltop Rd.
Elmsford, NY 10523
(914)-312-7646
Pn1356a@gmail.com

# EXHIBIT
# A

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Boston Area Office**
15 New Dudbury St, Room 475
Boston, MA 02203
(617) 865-3670
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 06/17/2025

**To:** Patrice Noel
14 Knolltop Rd
ELMSFORD, NY 10523
Charge No: 520-2025-01835

EEOC Representative and email:     HANH NGUYEN
Investigator
hanh.nguyen@eeoc.gov

---

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Feng K. An
06/17/2025
Feng K. An
Area Office Director

# EXHIBIT B

 Gmail

**Patrice Noel <pn1356a@gmail.com>**

## Thank You!

**Patrice Noel <pn1356a@gmail.com>**                                                        Tue, Jul 2, 2024 at 5:23 PM
To: Myranda Mendez <mmendez@ndsny.org>, Zainab Akbar <zakbar@ndsny.org>, Jacob Schneider
<jschneider@ndsny.org>, Summer O'Sullivan <Sosullivan@ndsny.org>, Shalonda Curtis-Hackett <SCurtis@ndsny.org>,
Monica Shah <mshah@ndsny.org>

Dear Zainab and the Family Defense Practice Team,

I want to thank you for interviewing me for the litigation assistant position both last week and today. The transparency and
understanding everyone displayed confirmed that NDS is a healthy and welcoming work environment for me.

Learning about the benefits and opportunities at NDS has only increased my interest in the position. My military
background as a paralegal has prepared me for the collaborative, holistic approach NDS takes in addressing clients' legal
issues.

I am particularly excited about the potential to shape this new role using my creativity and consulting skills to enhance
organizational efficiency. The dynamic and sensitive nature of the work promises intellectual stimulation and personal
growth, preparing me for a rewarding career as a public interest attorney.

My experience with diverse populations, combined with my perspective as a member of various minority communities, has
prepared me to interact with clients in a trauma-informed and understanding manner. Additionally, as a semi-impacted
person, there are great emotional rewards in this work that I would not experience elsewhere.

Thank you again for considering my application. I'm happy to answer any remaining questions and I am eager about the
possibility of contributing to the Family Defense Practice at NDS.

-Patrice Noel, JD

# EXHIBIT C

# N⅃⅃S

## NEIGHBORHOOD DEFENDER SERVICE
## OF HARLEM

### HARLEM

Board Chair
Matthew Mazur

Advisory Board Members
Jonathan Abady
Damaris Hernandez
Miriam Gohara
Melody Rollins-Downes
David Sanford
Elinor Tatum

CEO
Rick Jones

Managing Director
Piyali Basak



15) *The Union requests a copy of the investigation report conducted by HR/Management in response to the employee handbook policy outlined on page 11, which states:*

"NDS will promptly and thoroughly investigate all reports of threats of (or actual) violence and of suspicious individuals or activities."

The CBA fully adopts the employee handbook, and this request pertains to the proper handling of interpersonal conflict, as initially alleged in Step 1 grievance. The Union seeks this report to evaluate NDS's compliance with its stated policy in the context of this grievance.

**NDS' Reply**: First, assuming such a report existed, the CBA provision incorporating the terms of NDS' Employee Handbook (Handbook) does not create an obligation to disclose to the Union all evidence of investigations of potential threats of violence. Second, we find it hard to believe that the Union is seeking this information for any reason other than somehow to support the existing grievance regarding Ms. Noel. Third, the nature of Ms. Noel's actions did not require any form of investigation – she made a clear and explicit statement. There were no factual disputes. Moreover, the language in the Handbook is designed to address when employees or others bring concerns forward to management of the organization – "reports of threats" - - that is not what happened here. Ms. Noel is the one who made the threat, and it was heard directly by management. Thus, no such "investigation report" exists.

# EXHIBIT D

# NDS HARLEM

## NEIGHBORHOOD DEFENDER SERVICE OF HARLEM

Board Chair
Matthew Mazur

Advisory Board Members
Jonathan Abady
Damaris Hernandez
Miriam Gohara
Melody Rollins-Downes
David Sanford
Elinor Tatum

CEO
Rick Jones

Managing Director
Piyali Basak

### Patrice Noel Suspension and Termination Grievance Decision Following Second Step Meeting, Decision Dated June 27, 2025

The NDS Harlem (NDS) Union's (Union) grievance regarding the "suspension and termination of unit member Ms. Patrice Noel" is denied. NDS denies the alleged violations of the NDS Contract 2023-2026, Collective Bargaining Agreements between The Association of Legal Aid Attorneys – UAW Local 2325 and NDS (CBAs), "including but not limited to Section §3.6 (Interpersonal Conflict), and Section §3.1.1 (Non-Discrimination) based on violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §12112 et seq."

## Allegation Made by the Union

On or about January 10, 2025, the Union submitted its grievance and alleged NDS violated the CBAs "including but not limited to Section §3.6 (Interpersonal Conflict), and Section §3.1.1 (Non-Discrimination) based on violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §12112 et seq." Note that this is the sole grievance made by the Union in connection with NDS' placement of Ms. Noel on a paid suspension on November 26, 2024. As such, the Union's grievance relating to NDS' suspension of Ms. Noel's employment is late and, thus, unpreserved (for appeal), as it was made on January 10, 2025, more than thirty calendar days of NDS' suspension.[1]

## Procedural History

The parties met on February 3, 2025 for a Step One meeting and on June 5, 2025 for a Step Two meeting.

## Relevant Facts

Ms. Noel's first date of employment by NDS is August 12, 2024. NDS employed Ms. Noel as a Litigation Assistant during the period August 12, 2024 through December 12, 2024, a period of four months. NDS placed Ms. Noel on a paid suspension on November 26, 2024, within three and one-half months of the commencement of the employment relationship.

---

[1] CBAs Section 1.7.1., titled Initiation, states: "Prior to the submission of a formal written grievance, any matter concerning a specific individual, should be raised informally with that individual's immediate supervisor. Grievances must be filed in writing within thirty (30) calendar days of the event giving rise to the grievance, or within thirty (30) calendar days from when the event, with reasonable diligence, should have become known. The written statement must be sufficient to give notice that the matter is being grieved and should clearly articulate the issue(s) grieved, the relevant contract provision(s), and the relief sought."



**NEIGHBORHOOD DEFENDER SERVICE**
**OF HARLEM**

Board Chair
Matthew Mazur

Advisory Board Members
Jonathan Abady
Damaris Hernandez
Miriam Gohara
Melody Rollins-Downes
David Sanford
Elinor Tatum

CEO
Rick Jones

Managing Director
Piyali Basak

**Basis for Decision Denying the Grievance.**

The CBAs Section 3.3.1., titled Employment Status, Probationary Period, states:

"During the first six [6] months of employment (and twelve [12] months of employment for attorney positions), the employment relationship will be considered probationary and may be disciplined and/or discharged by the Employer at its sole discretion." Here, NDS terminated Ms. Noel's employment during the first **four** months of her employment, meaning the employment relationship was probationary. As such, pursuant to and in compliance with the CBAs, NDS could terminate Ms. Noel's employment "at its sole discretion." In other words, this grievance is invalid because Ms. Noel's employment was probationary.

Moreover, NDS did not engage in discrimination based on disability. NDS approved Ms. Noel's sole written request for disability accommodations.[2]

---

[2] In response to Ms. Noel's written request for accommodations on or about November 18, 2024, NDS discussed this list of accommodations with Ms. Noel on November 22, 2024. On November 25, 2024, NDS informed Ms. Noel that NDS was already meeting the listed accommodations except for one. NDS made this one additional accommodation. NDS memorialized the granting of all requested accommodations in writing and sent those to Ms. Noel on November 25, 2024.

*317 Lenox Ave, 10th Floor New York, NY, 10027, T. 212.876.5500, F. 212.876.5586, neighborhooddefender.org*

The Power of Public Defense

# EXHIBIT E

 Outlook



**From:** Patrice Noel <PNoel@ndsny.org>
**Sent:** Tuesday, November 26, 2024 11:33 AM
**To:** Carolyn Klemens <cklemens@ndsny.org>; Zainab Akbar <zakbar@ndsny.org>; Calypso Taylor <ctaylor@ndsny.org>; Shalonda Curtis-Hackett <SCurtis@ndsny.org>
**Cc:** Myranda Mendez <mmendez@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>
**Subject:** Re: Going forward

No but "running requests " for a lack of better words was, as I stated it's difficult to predict the flare ups. Additionally, I requested "flexible scheduling " which was granted and falls into this category. Not having AMY breathing down my neck was also a part of the request. No where does the law say that additional request cannot be made.

The only thing I'm trying to comprehend is how it's unreasonable. My experience has been that the LA intake job can be done virtually without impacting any essential job functions. Additionally NDS has endured for 10 years prior to the invention of the LA position. I believe it to be a very reasonable request especially given the supervisor and potential for escalation and harm.

Get Outlook for iOS

**From:** Carolyn Klemens <cklemens@ndsny.org>
**Sent:** Tuesday, November 26, 2024 11:13:24 AM
**To:** Patrice Noel <PNoel@ndsny.org>; Zainab Akbar <zakbar@ndsny.org>; Calypso Taylor <ctaylor@ndsny.org>; Shalonda Curtis-Hackett <SCurtis@ndsny.org>
**Cc:** Myranda Mendez <mmendez@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>
**Subject:** Re: Going forward

Hi all,
I am available tomorrow at 11am.
Patrice, I will send you the summation of our conversation with Dante yesterday regarding your accommodation. Working intake remotely was not part of your request or our discussion.
Thank you.

**From:** Patrice Noel <PNoel@ndsny.org>
**Sent:** Tuesday, November 26, 2024 10:45 AM

**To:** Zainab Akbar <zakbar@ndsny.org>; Carolyn Klemens <cklemens@ndsny.org>; Calypso Taylor <ctaylor@ndsny.org>; Shalonda Curtis-Hackett <SCurtis@ndsny.org>
**Cc:** Myranda Mendez <mmendez@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>
**Subject:** Re: Going forward

We are available to meet tomorrow at 11am.

Also I am requesting to do intake virtually as part of my reasonable accommodations, working in person with Amy is triggering my PTSD as a result of all of this being very fresh injury and escalating by the minute.

Get Outlook for iOS

**From:** Zainab Akbar <zakbar@ndsny.org>
**Sent:** Tuesday, November 26, 2024 9:49:32 AM
**To:** Patrice Noel <PNoel@ndsny.org>; Carolyn Klemens <cklemens@ndsny.org>; Calypso Taylor <ctaylor@ndsny.org>; Shalonda Curtis-Hackett <SCurtis@ndsny.org>
**Cc:** Myranda Mendez <mmendez@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>
**Subject:** Re: Going forward

OK, please keep me posted. This meeting should occur this week, so please let me know of the remaining times I've provided when you and a delegate are available.

Intake has to be done in person, so just let the intake team know that you're running late.

--
Zainab Akbar | Managing Attorney | Family Defense Practice
Neighborhood Defender Service of Harlem
317 Malcolm X Blvd., 10th Fl. | New York, NY 10027
T: 212.876.5500 | C: 646-592-2395 | F: 646-924-3237
Pronouns: She/Her

NDS THE POWER OF PUBLIC DEFENSE

**From:** Patrice Noel <PNoel@ndsny.org>
**Sent:** Tuesday, November 26, 2024 9:17 AM
**To:** Zainab Akbar <zakbar@ndsny.org>; Carolyn Klemens <cklemens@ndsny.org>; Calypso Taylor <ctaylor@ndsny.org>; Shalonda Curtis-Hackett <SCurtis@ndsny.org>
**Cc:** Myranda Mendez <mmendez@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>
**Subject:** Re: Going forward

Hello,

I've gotten in touch with the union reps, today doesn't work for them. When we come up with a time that works for everyone we will reach back out.

Additionally, I am requesting to do intake from home today and tomorrow. Please let me know if that's possible. If not, please excuse a late arrival.

Thank you

Get Outlook for iOS

**From:** Zainab Akbar <zakbar@ndsny.org>
**Sent:** Monday, November 25, 2024 8:04:45 PM
**To:** Patrice Noel <PNoel@ndsny.org>; Carolyn Klemens <cklemens@ndsny.org>; Calypso Taylor <ctaylor@ndsny.org>; Shalonda Curtis-Hackett <SCurtis@ndsny.org>
**Cc:** Myranda Mendez <mmendez@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>
**Subject:** Re: Going forward

The agenda is that we will discuss your performance up until now and expectations going forward, many of which I've already emailed you about.

I'm looping in Shalonda and Calypso to streamline scheduling. Of the times I suggested, Patrice suggested meeting at 10am tomorrow. Does that work for you Calypso and/or Shalonda? . I am available between 9am and 12p on Tuesday or on Wednesday between 9am and 230pm or on Friday between 10am and 2pm.

--
Zainab Akbar | Managing Attorney | Family Defense Practice
Neighborhood Defender Service of Harlem
317 Malcolm X Blvd., 10th Fl. |, New York, NY 10027
T: 212.876.5500 | C: 646-592-2395 | F: 646-924-3237
Pronouns: She/Her



**From:** Patrice Noel <PNoel@ndsny.org>
**Sent:** Monday, November 25, 2024 6:22 PM
**To:** Zainab Akbar <zakbar@ndsny.org>; Carolyn Klemens <cklemens@ndsny.org>
**Cc:** Myranda Mendez <mmendez@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>
**Subject:** Re: Going forward

As per my accommodations is it possible  to receive an agenda regarding what specifically you plan to discuss so I'm prepared?

Get Outlook for iOS

**From:** Patrice Noel <PNoel@ndsny.org>
**Sent:** Monday, November 25, 2024 6:19:34 PM
**To:** Zainab Akbar <zakbar@ndsny.org>; Carolyn Klemens <cklemens@ndsny.org>
**Cc:** Myranda Mendez <mmendez@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>
**Subject:** Re: Going forward

I was told Shalonda and Calypso would reach out to me ASAP. However I haven't heard from them yet. So I'm trying to give them some time. To get back to me.

Get Outlook for iOS

**From:** Zainab Akbar <zakbar@ndsny.org>
**Sent:** Monday, November 25, 2024 6:02:45 PM
**To:** Carolyn Klemens <cklemens@ndsny.org>; Patrice Noel <PNoel@ndsny.org>
**Cc:** Myranda Mendez <mmendez@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>
**Subject:** Re: Going forward

Following up. Patrice —are you having a delegate join us tomorrow at 10am or just meeting with me and Carolyn? If a delegate is not available, we can select another time.

--

Zainab Akbar | Managing Attorney | Family Defense Practice
Neighborhood Defender Service of Harlem
317 Malcolm X Blvd., 10th Fl. | New York, NY 10027
T: 212.876.5500 | C: 646-592-2395 | F: 646-924-3237
Pronouns: She/Her



**From:** Carolyn Klemens <cklemens@ndsny.org>
**Sent:** Monday, November 25, 2024 4:26 PM
**To:** Zainab Akbar <zakbar@ndsny.org>; Patrice Noel <PNoel@ndsny.org>
**Cc:** Myranda Mendez <mmendez@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>
**Subject:** Re: Going forward

Hi,

I am available tomorrow at 10am.

---

**From:** Zainab Akbar <zakbar@ndsny.org>
**Sent:** Monday, November 25, 2024 4:12 PM
**To:** Patrice Noel <PNoel@ndsny.org>; Carolyn Klemens <cklemens@ndsny.org>
**Cc:** Myranda Mendez <mmendez@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>
**Subject:** Re: Going forward

Good afternoon,

Looping in Carolyn for scheduling purposes. This will be a disciplinary meeting. Please let me know which delegate you would like present so we can ensure that they can attend tomorrow at 10am.

--

Zainab Akbar | Managing Attorney | Family Defense Practice
Neighborhood Defender Service of Harlem
317 Malcolm X Blvd., 10th Fl. | New York, NY 10027
T: 212.876.5500 | C: 646-592-2395 | F: 646-924-3237
Pronouns: She/Her



---

**From:** Patrice Noel <PNoel@ndsny.org>
**Sent:** Monday, November 25, 2024 3:47 PM
**To:** Zainab Akbar <zakbar@ndsny.org>
**Cc:** Myranda Mendez <mmendez@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>
**Subject:** Re: Going forward

Hi Zainab,

Unfortunately, No I am not well.

I am available to meet tomorrow at 10am.

Since I am allowed to bring a delegate does that mean this meeting is investigatory or disciplinary?

Additionally, can you please have Amy in the loop...not doing so is exacerbating problems especially since she's the main complainant.

Additionally, I ask that you please provide me with a brief written document listing the accusations pertaining to the specific assignments that were alleged to be late or deficient in the first 2 months of Employment.

-Patrice

---

**From:** Zainab Akbar <zakbar@ndsny.org>
**Sent:** Monday, November 25, 2024 2:17 PM
**To:** Patrice Noel <PNoel@ndsny.org>
**Cc:** Myranda Mendez <mmendez@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>
**Subject:** Going forward

Hi Patrice,

I hope you're well. My understanding is that you've met with HR and your accommodation requests have been granted, including a reduction in the frequency of supervision, as you requested in discussions with me in the past. Starting this week, you will be meeting once per week for supervision with Myranda. To prepare for this change, as well as to discuss your performance up until now and expectations going forward, you and I will be meeting this week, along with someone from HR. I am available between 9am and 12p on Tuesday or on Wednesday between 9am and 230pm or on Friday between 10am and 2pm. As per the CBA, you may bring a union delegate to this meeting . Please reply with your availability as well as which delegate, if any, you would like to accompany you to this meeting.

--
Zainab Akbar | Managing Attorney | Family Defense Practice
Neighborhood Defender Service of Harlem
317 Malcolm X Blvd., 10th Fl. | New York, NY 10027
T: 212.876.5500 | C: 646-592-2395 | F: 646-924-3237
Pronouns: She/Her



# EXHIBIT
# F

NDS Detroit

## Disciplinary Action Form

| Check all that may apply: | |
|---|---|
| o  Tardiness | ●  Misconduct |
| o  Absenteeism | o  Behavior inconsistent with NDS values |
| o  Poor work performance | o  Work rule violation |
| o  Misuse of company property | o  Other: _____ |

Employee Name: Patrice Noel _____    Date of Infraction: __11_/ _26_ / _2024_

Supervisor Name: Myranda Mendez and Zainab Akbar    Date of Issuance: __11_/ _26_ / _2024_

Brief Description of Incident:

While Carolyn Klemens and Dante (Taylor) Browne were discussing Patrice Noel's accommodations recap that was

discussed and approved verbally with Patrice on 11/25 and then shared in email on the morning of 11/26, Patrice

stated that she did not know whether or not her meeting with Amy Armstrong would result in violence due to the effects

of Patrice's PTSD triggered reactions of fight/flight/freeze.                            *could* m.

Discipline Level:

| | |
|---|---|
| _____ Follow Up to Verbal Discussion | _____ Probation – 30 days |
| _____ Written Warning | _____ Probation – 60 days |
| ✓ Suspension ( _15_ (#) of days) | _____ Performance Improvement Plan |
| _____ Termination (LDW: _____ ) | |

Action required from employee:

This is a paid suspension. Patrice's access will be terminated and is prohibited from coming to NDS offices or accessing

NDS systems or contacting NDS clients while on suspension.

Employee Signature: _____    Date: _____

HR Signature: _~signature~_____    Date: 11/26/2024

# EXHIBIT G



## Suppression of Supportive Testimony

# EXHIBIT H

# NEIGHBORHOOD DEFENDER SERVICE
## OF HARLEM

**NDS**
**HARLEM**

Board Chair
Matthew Mazur

Advisory Board Members
Jonathan Abady
Damaris Hernandez
Miriam Gohara
Melody Rollins-Downes
David Sanford
Elinor Tatum

CEO
Rick Jones

Managing Director
Piyali Basak

### NDS Harlem's (NDS) Second Reply to the NDS Harlem Union's Response to NDS' First Reply to Requests for Information 1 and 2 Dated April 7, 2025 in Connection with Patrice Noel Grievance, NDS' Second Reply Dated May 13, 2025 and Provided to Union Delegate Shalonda Curtis-Hackett

Please note that we restate and reassert all of our general objections to your information request. We, however, appreciate that the Union has significantly narrowed its request, and we acknowledge Ms. Noel's health care information release form.

With that said, the Neighborhood Defender Service of Harlem (NDS) responds as follows:

**4)** *Union Requires copies of or access to the teams chats referenced in the investigation of Patrice Noel.*

Access to Correspondence with Amy Armstrong, Dante Brown, Carolyn Klemens.

[Union's] Response: The Union withdraws this request for correspondence between Amy Armstrong and requests copies of or access to the teams chat between Patrice Noel, Dante Brown & Carolyn Klemmons on the dates of Nov 22nd, 25th & 26th. Provided is a Hippa Release from Ms Noel that satisfies the objection due to confidential health and medical circumstances.

**NDS' Reply**: Without waiving our prior objections to these requests, NDS attaches the below two Microsoft Teams chats (chats) between Patrice Noel, Dante Brown and Carolyn Klemens. NDS does not have records of any chats between Patrice Noel, Dante Brown and Carolyn Klemens on November 22, 2024.

a) Chat dated November 25, 2024 and
b) Chat dated November 26, 2024, including one attachment titled, Patrice Self Performane (sic) Improvement Plan.

**8)** *All email threads between Carolyn Klemens and Patrice Noel.*

[Union's] Response: The Union is amending its request to limit the scope to email threads between Carolyn Klemens and Patrice Noel that specifically discuss the accommodation process, including the November 26 email thread initiated by Ms. Akbar, which led to the meeting in which Ms. Noel was terminated. The specific teams chat dates requested are November 22nd, 25th and 26th.

As this request pertains solely to the accommodation process, there is no confidential medical information involved. This information is directly relevant to the grievance, as it pertains to whether or not NDS violated the ADA in the accommodation process.

*317 Lenox Ave, 10th Floor New York, NY, 10027, T. 212.876.5500, F. 212.876.5586, neighborhooddefender.org*
The Power of Public Defense

# N)S
## HARLEM

**NEIGHBORHOOD DEFENDER SERVICE**
**OF HARLEM**

Board Chair
Matthew Mazur

Advisory Board Members
Jonathan Abady
Damaris Hernandez
Miriam Gohara
Melody Rollins-Downes
David Sanford
Elinor Tatum

CEO
Rick Jones

Managing Director
Piyali Basak

Therefore, the Union respectfully requests that NDS comply with this amended request and provide the relevant email threads.

**NDS' Reply**: The contractual grievance process expressly applies to "disputes concerning interpretation or application of a specific provision of this Agreement." It does not address alleged violations of the ADA or any other statute. Moreover, there is no obligation to provide information to investigate or provide discovery for potential litigation unrelated to the grievance process.

13) "Full Teams chat transcripts between Patrice and the following individuals whom are all either HR, her supervisors in some capacity or attorneys on her team…"

[Union's] Response: The Union is amending its request to include full team chat transcripts between Patrice Noel and the following individuals:

- Carolyn Klemens
- Dante Taylor Brown

Dante Brown Taylor and Carolyn Klemens were directly involved and made the joint decision to terminate Ms. Noel's, and the information contained in their chat transcripts is essential to determining whether Ms. Noel requested union representation prior to the meeting in which she was suspended and subsequently terminated. As previously stated, the contents of the chats are very brief, The Union seeks this information to ensure a complete understanding of the circumstances surrounding Ms. Noel's termination, and we expect NDS to cooperate in providing these documents. Specific dates requested are Nov 22nd, 25th, & 26th

**NDS' Reply**: Without waiving any prior objections to these requests and without conceding that your asserted basis for the request establishes the relevance, please see NDS' Reply to Request for Information #4 above.

14) Summary of November 6th conversation between Ms. Dori Brail and Miss Patrice Noel

**NDS' Reply**: Without waiving any other objections to such a request, a written summary of this conversation does not exist, and we are under no obligation to create one.

# EXHIBIT I



SCREENSHOT'S OF AKBAR'S DISPARATE RESPONSE

# EXHIBIT
# J

Outlook

**Re: How to support me in a trauma informed way.**

**From** Patrice Noel <PNoel@ndsny.org>

**Date** Mon 11/18/2024 11:56 PM

**To**  Zainab Akbar <zakbar@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>; Myranda Mendez <mmendez@ndsny.org>

📎 1 attachment (84 KB)

Patrice Self Performane Improvement Plan.pdf;

I would apologize for the delay, but no one's sorrier than I am. I hope the attached plan brings the daily check-ins to a formal end.

Please see the attached alternative performance improvement plan/"supervisory plan"/ modified surveillance stipulation. I hope this helps to reimagine the supervisory approach in a way that serves the organization best.

Formal accommodations have also been requested.

I was also going to say "please respond as you see fit"....but NOPE too dangerous!...Please respond with a proposal of how you would like to proceed.

-Patrice

---

**From:** Patrice Noel

**Sent:** Wednesday, October 30, 2024 7:08 PM

**To:** Zainab Akbar <zakbar@ndsny.org>; Jacob Schneider <jschneider@ndsny.org>; Myranda Mendez <mmendez@ndsny.org>

**Subject:** How to support me in a trauma informed way.

Supervisory Team,

Because management deems daily surveillance meetings to be necessary to cure the purported deficiencies, despite not having given me a chance to self-correct, my mental/emotional health has deteriorated gravely.

Although I have begged, plea'd and explained to ZA the effects these meetings will/ are having on me, no changes have been made which sends the message that my mental health isn't valued by management the same way I value it. That would be a very hard pill to swallow, and I hope its not the case.

Therefore, it has occurred to me that maybe management is unaware of how to supervise in a trauma informed way. Subsequently, since I am great at identifying deficiencies, investigating the causes, and applying an appropriate solution to yield results, I have decided it's necessary to do so for you too.

The biggest failure of the current "supervisory plan" is that it isn't trauma informed. Due to my exhaustion, I have enlisted the support of Chat GPT to do the onerous task of explaining how this can be accomplished. The portions highlighted in green are to emphasize their applicability to this current situation as this is a vague guide.

I will send a follow up email with a more detailed self-correcting performance improvement plan.

Supporting a paralegal with CPTSD, especially given their past experiences with toxic leadership and micromanagement, requires a mindful and trauma-informed approach. Here are some ways to help them feel secure, empowered, and respected in your team:

1. **Prioritize Transparent, Consistent Communication:** Be clear about your expectations, while also maintaining a supportive, non-pressuring tone. Providing detailed instructions upfront (e.g., written guidelines or checklists) can help alleviate any anxiety over misunderstanding tasks without feeling like micromanagement.

2. **Build Trust Gradually**: Since they've experienced toxic leadership, trust-building will be essential. Be open, approachable, and consistent. Trust can grow as they see you respect their autonomy and support their needs.

3. **Adopt a Non-Micromanagement Approach**: Regularly reassure them that you value their judgment and experience. When offering feedback, frame it as collaboration or guidance rather than correction. Give them space to tackle tasks and check in only as needed.

4. **Set Up a Trauma-Informed Work Environment:** Foster a workplace culture where the paralegal feels psychologically safe. Be mindful of potential triggers, like abrupt changes in direction, and avoid high-pressure tactics that could replicate past stressors.

5. **Respect Their Boundaries:** Check in about their preferred work style and any boundaries they need in order to feel comfortable. For instance, if they prefer not to handle certain high-stress cases or need breaks to recharge, accommodate these requests wherever possible.

6. **Encourage Autonomy and Agency:** Give them ownership over their projects, even encouraging them to suggest improvements. This can help rebuild their confidence and empower them to feel more independent and valued.

7. **Provide Resources for Wellbeing**: If available, offer access to wellness resources like counseling, resilience training, or a quiet workspace where they can decompress as needed.

8. **Check Your Leadership Approach for Sensitivity:** Reflect on your own leadership style to ensure it promotes mutual respect and understanding. Acknowledge their past military experience and validate the unique strengths they bring to the role, while making it clear that the culture here is one of support, not command.

Creating a safe, compassionate environment with open communication and consistent support can make a substantial difference for someone navigating CPTSD while integrating into a new role.

Thanks,

**Patrice Noel** | Litigation Assistant | Family Defense Practice
Neighborhood Defender Service of Harlem
317 Malcolm X Blvd., 10th Fl. | New York, NY 10027
T: 212.876.5500 | C: 646-901-0137 | F: 646-924-3237
Pronouns: She/Her



*Confidentiality Notice: The information contained in this transmission is attorney privileged and/or confidential information intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited.*

# **Patrice's Performance Self-Improvement Plan**

## **Introduction**

The purpose of this document is to assist NDS Harlem FDP Management, in reimagining their current supervisory plan to be more collaborative and less hands on, and address the complaints resulting from the perception of my performance in the first two months of employment and lack of communication and expectations.

# **#1**

**Complaint:** Assignments take too long to complete.

**Analysis:** The only assignments I had that "took long" were records request. I had no reference point for how long was "too long". It was never brought to my attention by any attorney that the records were taking longer than normal. Doing so would have allowed me to address the problem earlier on, prior to it becoming "too long". Additionally, some 2/3 records request assignments were follow ups on previous records request that had been made months prior to my employment, meaning that the service providers/3rd parties whom I was tasked with getting the records from were already giving us difficulty. So I feel as if any commentary on those 2 assignments is unfair.

**Plan:** In efforts to expedite the retrieval of records, I will get all requests out in 24-48 hours and follow up on all records requested, every Wednesday to avoid the "beginning of the week/end of the week" work product crescendos/decrescendos. Additionally, I am tracking the communication with the service provider regarding the records by entering it into DD, and alerting attorneys through Dd. Lastly, to save time and confusion, I will CC the attorney or Myranda on the email thread if and when a problem arises, or I see the potential for a problem.

**Potential flaws in plan:**

- Since this plan is only regarding records, and there are many other types of assignments I haven't yet been assigned, I am not aware of how I will perform and or meet the expectations of my team members. Therefore, it is possible new types of assignments may also take me log, at which point we would have to re-access the solution.
- Attorneys aren't always aware of other assignments going on so giving me accurate deadline information will better allow me to triage the assignments so that everyone is better taken care of.

# #2

**Complaint:** Not enough communication regarding the status of Work

**Analysis:** Again, as I mentioned in the previous section, there was a lack of awareness of expectations and communication of the same. In recalling potential communication surround the status of the records, I recall being asked "how's it going with the records?". I responded it was going well (because it was to me) and I may have said I'm going to go in person because I haven't gotten much back. That communication is not the same as "hey what's delaying the records? They are typically here by now". From my perspective at the time, updating the attorney with the fact that I emailed and called multiple days in a row would be counter efficient, compared to just continuing to retrieve the records.

**Plan:** However, now I understand some attorneys need constant updates, as it is a new process and they are not yet aware of my capabilities and or communication style. Therefore to avoid future confusion as to the status of work, In addition to the steps listed in plan number 1, I also intend to give and estimate of when I think I can complete an the assignment upon request of the task. Then I will negotiate and communicate with the attorney to see if that works for them. If anything comes up between the time I'm assigned and the estimated deadline that I believe may delay me in completing the assignment , I will promptly communicate with the attorney and their supervising attorney to inform them of the change in plans and see if there is a work around or in the event I am unable to, communicate with Myranda and see if she can assign another LA or assist herself. I

If the assignment is one that is inherently long/tedious in nature I will give the attorney an estimated deadline and request that they just "Pull the assignment" for a lack of better words, when they know they need the assignment for their case now or they'd rather finish it themselves because time is of the essence. This will enable me to still assist yet lower the pressure and anxiety of failure by missing a deadline. It also allows the attorney flexibility since they aren't use to working with a litigation assistant.  Lastly, I will encourage the attorneys to communicate with me in an open and blatant manner to ensure efficiency.

**Potential flaws in plan:**

- Attorneys may feel uncomfortable approaching me , as I already sense.
- When they do approach me, they may struggle to communicate the urgency due to unnecessary sugarcoating and tiptoeing around perceived potential feelings.

# #3

**Complaint:** Ask too many questions, attorney would rather do it themselves

**Analysis:** Quite frankly this shouldn't have even been mentioned to me as "feedback" because asking questions is an inherent part of the learning process when working within a new establishment. Asking anyone and everyone questions shouldn't be a problem. The questions I asked were in efforts to understand the attorney's preference or SOP, therefore asking Myranda, wouldn't be useful. Additionally, "too many questions" is subjective and thus related to a person's previous experiences. So, if an attorney, was previously doing everything themselves, sans TA's, then being forced to work with anyone who is learning will inherently yield the same results. This complaint wasn't investigated enough prior to being presented. It was assumed that the number of questions was related to a level of competency, which isn't the case. It was due to previous experiences and expectations as a paralegal for 10+ years.

**Plan:** I will continue to ask questions to whom I deem appropriate and suitable to ask questions to at the given time. If an attorney is busy or unable to take time to answer my questions, they can simply get back to me when they can or request, I ask someone else. Typically, if there is someone else to ask, It is my standard practice to ask the least busy person, or the person best suited to answer my question. Communication is a two-way process. Now that I am aware that there are no SOPs or attorney preferences and we just savagely approach records requests, this will no longer be a problem whatsoever.

Additionally, I find that I receive more immediate direct help when I ask another LA vs asking Myranda because they are more aware of the potential confusion as they were trained the same time as me. Whereas Myranda, being the trainer vs trainee, has more guessing to do when it comes to my question because she didn't experience the training the way I did. So I will continue to ask other LAs and/or Myranda when feasible.

Lastly, I can't imagine many instances in which I would need to ask Jacob or Zainab a question that nobody else in the entire organization is available to answer. A question which only you two could answer would only be regarding structural or systemic issues related to our practice. Asking either MA or DMA any other question would be an inefficient use of their time as I am sure there are several more pressing issues.

**Potential flaws in plan:**

- Asking someone else instead of the attorney could lead to the wrong answer, because now I'm playing telephone seeking information about a task from one person, from another person. The less middlemen the better.

---

# #4

**Complaint:** Frequently Late to intake

**Analysis:** There has never been a day from hire to now where a case has came in on intake prior to 10:30am while I was there. Every time I was late my supervisor was notified and explained why. Also different Intake Supervisors have different preferences as to the arrival of LAs, so I wasn't aware that this was an issue, nor that my supervisor saw this as an issue. Additionally at the time of this complaint, the LAs hadn't yet even had the training where we went over what to do on intake. Even post training, there are still many issues with the efficiency of Intake and LAs attendance at Intake. So the mere focus on what time I arrive seems misguided. There is no need for a solution to something that is not a problem.

**Plan:** I will continue to try to arrive on time to intake, and I will seek accommodations from HR regarding the same due to any potential time blindness that may occur in the future in addition to unforeseen issues.  I will also continuously remind attorneys I am available at their discretion on intake. In the rare case where me being late to intake *actually* becomes problematic then arrangements can be made to reevaluate my duties I guess.

**Potential Flaws in Plan:** Not Applicable

# Conclusion:

These complaints could have been received and corrected without the need for daily or weekly check ins. The implementation of which was extremely unnecessary, against my spoken pleas, and counterproductive. These meetings have had no benefit that couldn't have been achieved in a less restrictive manner.  The daily surveillance meetings and subsequent emotional/psychological fallout from them, have made it more difficult for me to perform the work I was hired to do, and is grossly contradictory to the ethos and mission of NDS. Abolitionists aim for collaboration and support in attempting to address a perceived problem.

To Avoid future issues of a similar nature, complaints should be investigated more in detail and weighed against other variables that may mor may not have contributed to the situation, *prior* to implementing an intense oversight plan or any plan. Additionally, since the litigation assistant position is new to the organization there are going to be massive miscommunications and misunderstandings of varying degrees on various levels. The best way to mitigate these inevitable mishaps, is to investigate, communicate and address.... early, on spot. Currently, there are still many systemic issues that need to be worked out for NDS to run smoother.

While I understand there was no ill intent in these actions, the lack of respect given to my continued rebuttal and protest, is unexplainable. From the initial notification of the meeting until now there was never a collaborative approach and after the implementation of the plan, even less consideration was given to my situation. No other LA had the surveillance plan happened and it's not because they comprehended everything better than me (as evidenced by the things they are still asking about long past our 2 month check in) . It's because they /their supervisors took a different approach. Not having an alternative plan to a *perceived* problem doesn't justify *disparate treatment* or the continued use of a harmful plan. The willful disregard of my physical, emotional, and psychological well-being was never explained; the impact of which has been grave and potentially irreparable given the duration of the situation. The damage to the trust and confidence I had in not only NDS, but Management, and the slayers has drastically diminished. While disappointed and not optimistic, I hope there is a way forward.

# EXHIBIT K

**From:** Carolyn Klemens
**To:** Roxanna Gutierrez; Matt Knecht
**Subject:** Fw: Meeting request
**Date:** Wednesday, May 7, 2025 5:19:07 PM
**Attachments:** Outlook-mjw45onv.png

---

**From:** Carolyn Klemens <cklemens@ndsny.org>
**Sent:** Thursday, November 21, 2024 6:29 PM
**To:** Patrice Noel <PNoel@ndsny.org>
**Cc:** Dante' Taylor <dtaylor@neighborhooddefender.org>
**Subject:** Re: Meeting request

Hi,

Dante Taylor, HR Director, and I have had a chance to review your provider's documentation and your request, and hope to meet with you tomorrow to review. We are all free at 1pm, and I will send you an invite.

Have a good evening,

Carolyn

---

**From:** Patrice Noel <PNoel@ndsny.org>
**Sent:** Tuesday, November 19, 2024 10:35 AM
**To:** Carolyn Klemens <cklemens@ndsny.org>
**Subject:** Re: Meeting request

Yes I am, im currently trying to get out of it as we speak.

---

**From:** Carolyn Klemens <cklemens@ndsny.org>
**Sent:** Tuesday, November 19, 2024 10:34 AM
**To:** Patrice Noel <PNoel@ndsny.org>
**Subject:** Re: Meeting request

Hi,

Thanks for providing this. I have to focus on payroll right now but will get back to you by the end of the week.

Just to confirm, are you still having the daily check-ins?

Talk soon,

Carolyn

---

**From:** Patrice Noel <PNoel@ndsny.org>
**Sent:** Monday, November 18, 2024 10:59 PM
**To:** Carolyn Klemens <cklemens@ndsny.org>
**Subject:** Re: Meeting request

Actually, the second letter came quicker than anticipated. See attached.

This list isn't all inclusive, this is just what we came up with for immediate attention.

Please let me know next steps as far as implementation.

-Patrice

**From:** Patrice Noel <PNoel@ndsny.org>
**Sent:** Monday, November 18, 2024 3:46 PM
**To:** Carolyn Klemens <cklemens@ndsny.org>
**Subject:** Re: Meeting request

Thank you Carolyn!

Please see attached letter from my therapist. A more detailed one is to follow w specific accommodation request. I hope this can at least place a pin in the current situation. I would also like to hear about the conversation with management regarding the daily check-ins.

Thank you for the disability application. I will discuss with my mental health professionals and keep you posted.

Regarding the non applicability of the CBA to LA's , I'm sure that it was written that way at the time because the LA position didn't exist. Also, it was touted as one of the job benefits to us specifically before and after being hired. This is concerning, because now this is another sub problem.

-Patrice

**From:** Carolyn Klemens <cklemens@ndsny.org>
**Sent:** Wednesday, November 6, 2024 5:28 PM
**To:** Patrice Noel <PNoel@ndsny.org>
**Subject:** Re: Meeting request

Hi,

I just wanted to check in. I hope things are going better for you.

I wanted to follow up from our 11/1/24 meeting. You asked about an accommodation. As I explained, please make your request in writing along with the substantiating medical documentation from your treating physician. Then HR can evaluate your request and respond accordingly.

You also asked about a Short-Term Disability (STD) leave. I explained that you would be eligible to apply the first of the month after 90 days of employment, or 12/1/24. The application form is attached. You then asked if the time off provided by section 3.3.2 of the CBA entitled "Bar Examination" could be added to a potential STD leave. However, this assumes that this benefit applies to the position of Litigation Assistant, and it does not. This time-off benefit only applies to Law Graduates employed in the position of Staff Attorney.

Please let me know if you have any questions.

Best,
Carolyn

**From:** Patrice Noel <PNoel@ndsny.org>
**Sent:** Friday, November 1, 2024 10:40 AM
**To:** Carolyn Klemens <cklemens@ndsny.org>
**Subject:** Re: Meeting request

Yes, that works. Thank you!


**From:** Carolyn Klemens <cklemens@ndsny.org>
**Sent:** Friday, November 1, 2024 10:25 AM
**To:** Patrice Noel <PNoel@ndsny.org>
**Subject:** Re: Meeting request

Hi,
Does 1pm work? I can send you an invite.


**From:** Patrice Noel <PNoel@ndsny.org>
**Sent:** Thursday, October 31, 2024 9:49 AM
**To:** Carolyn Klemens <cklemens@ndsny.org>
**Subject:** Meeting request

Good morning Carolyn,

Do you have time to meet today to discuss Accommodations, Leave requests and discrimination claim Questions ? I'm available anytime today.

**Patrice Noel** | Litigation Assistant | Family Defense Practice
Neighborhood Defender Service of Harlem
317 Malcolm X Blvd., 10th Fl.  | New York, NY 10027
T: 212.876.5500  |  C: 646-901-0137  |  F: 646-924-3237
Pronouns: She/Her



*Confidentiality Notice: The information contained in this transmission is attorney privileged and/or confidential information intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited.*