RECEIVED
SDNY PRO SE OFFICE

2025 DEC -9  PM 4: 04

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
PATRICE NOEL,

                              Plaintiff,                          Civil Action No. 25 cv 6995

        -against-                                                FIRST AMENDED
                                                                 COMPLAINT

NEIGHBORHOOD DEFENDER SERVICE INC.,                               JURY TRIAL
ASSOCIATION OF LEGAL AID ATTORNEYS –                             DEMANDED
UAW LOCAL 2325, ZAINAB AKBAR, CAROLYN
KLEMENS, DANTÉ BROWNE, MATTHEW KNECHT,
SHANNON ANGLERO, PIYALI BASAK,  JACOB
SCHNEIDER, AMY ARMSTRONG, MYRANDA
MENDEZ, ROXANNA GUTIERREZ, and RICK JONES

                              Defendants.
-----------------------------------------------------------X

## STATEMENT OF THE CASE

1.      This is a civil rights and labor action against Neighborhood Defender Service of Harlem ("NDS") and the Association of Legal Aid Attorneys, UAW Local 2325 ("ALAA"). Plaintiff Patrice Noel—a Black, disabled Army veteran and neurodivergent professional—was subjected to disability discrimination and retaliation by NDS, and then denied fair and timely representation by her Union.

2.      After disclosing PTSD and ADHD, Ms. Noel was met not with support but with escalating micromanagement, disregard of medical information, and the denial of reasonable accommodations.

3.      NDS imposed a daily check-in structure that Ms. Noel repeatedly warned would worsen her symptoms. Rather than adjust it, NDS intensified the requirement and then used the foreseeable effects as a pretext for discipline and termination.

4.      Throughout her suspension and in the period leading up to her termination, Ms. Noel sought assistance from ALAA. The Union did not respond, investigate, or intervene. After the termination, ALAA again failed to pursue available contractual remedies, provided legally incorrect guidance, and responded with delay and indifference that prolonged the harm caused by NDS.

5.      This action seeks to hold NDS liable for violating federal, state, and city law and to hold ALAA liable for breaching its duty of fair representation. As a result of both Defendants' actions, a disabled Black veteran was left without the protections guaranteed by the law and the collective bargaining agreement.

## PRELIMINARY STATEMENT

6.      This case exposes a profound contradiction: an organization that claims to defend justice and equality instead turned its own workplace into a site of discrimination, retaliation, and abuse. Behind its public commitments to equity, Neighborhood Defender Service ("NDS") ignored disability disclosures, denied accommodations, and weaponized supervision against the very employee it recruited for her skill and resilience. What unfolded was not an ordinary employment dispute; it was the predictable result of an institution choosing control over compliance, and punishment over protection.

7.      Plaintiff Patrice Noel's termination was not the product of misconduct or incompetence. It was the culmination of deliberate choices by NDS leadership: to disregard her disclosures of PTSD and ADHD, to intensify rather than adjust harmful practices, and to penalize her for insisting on her rights.

8.      Ms. Noel repeatedly informed her supervisors that the daily check-in structure they imposed would worsen her PTSD and ADHD symptoms. Rather than modify or remove it,

NDS doubled down—then pointed to the predictable decline in her functioning as a pretext for discipline and termination.

9.     After her termination, Ms. Noel sought assistance from her Union, the Association of Legal Aid Attorneys, UAW Local 2325 ("ALAA"). Rather than investigate or advocate on her behalf, the Union failed to pursue available contractual remedies, minimized clear evidence of disability-based discrimination, and provided legally incorrect and dismissive guidance. This inaction deprived Ms. Noel of meaningful representation and prolonged the harm caused by NDS's conduct.

10.     This action seeks to hold NDS accountable for violating federal, state, and city law and to hold ALAA accountable for breaching its duty of fair representation. Together, Defendants' conduct left a disabled Black veteran without the protections the law and the collective bargaining agreement promise.

**JURISDICTION**

11.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq.; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq.; 42 U.S.C. § 1981; and § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, which governs Plaintiff's claim that the Association of Legal Aid Attorneys, UAW Local 2325 ("ALAA") breached its duty of fair representation.

12.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's related claims under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq.; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin.

Code § 8-101 et seq.; and New York common law. These claims arise from the same nucleus of operative fact as the federal claims asserted against both NDS and ALAA.

13.    The Court has pendent party jurisdiction under 28 U.S.C. § 1367(a) over all individual defendants, as the state and city claims asserted against them arise from the same events as the federal claims.

14.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred within this District. Defendant NDS is headquartered here, the individual defendants worked here during the relevant period, and ALAA's principal place of business is located in New York, New York. All acts of discrimination, retaliation, and unlawful conduct, including the Union's breach of its duty of fair representation, occurred within this District.

## ADMINISTRATIVE PROCEDURES

15.    Prior to initiating this action, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging violations of the Americans with Disabilities Act of 1990 ("ADA") and Title VII of the Civil Rights Act of 1964 ("Title VII") by Defendant Neighborhood Defender Service Inc. ("NDS").

16.    On June 18, 2025, the EEOC issued Plaintiff a Notice of Right to Sue, attached as *Exhibit A*. This action is filed within ninety (90) days of her receipt of that notice. Accordingly, all administrative prerequisites for Plaintiff's federal claims against NDS have been satisfied.

17.    Before commencing this litigation, Plaintiff also sent eleven (11) detailed demand letters to NDS and its leadership, outlining her claims, factual chronology, and supporting evidence. These letters contain allegations and documentation that directly align with, and in

some instances expand upon, the facts set forth in this Complaint. NDS refused to forward two of these letters to their intended recipients, further obstructing resolution.

18.     Plaintiff also pursued internal remedies under the Collective Bargaining Agreement ("CBA"). Her Union filed a grievance on January 10, 2025. A Step 1 meeting was held on February 3, 2025, followed by NDS's Step 1 decision on February 26, 2025. The Union appealed on March 7, 2025. A Step 2 meeting was held on June 5, 2025, and NDS issued its Step 2 decision on June 27, 2025.

19.     The grievance proceeded to arbitration pursuant to Article 1.7 of the CBA. On November 11, 2025, the parties submitted pre-hearing briefs. On December 2, 2025, the Arbitrator issued an Interim Award finding the Article 3.1.1 nondiscrimination claim arbitrable but staying the merits hearing pending the end of this lawsuit. The arbitration remains stayed.[1]

20.     Plaintiff's claims against the individual Defendants are brought under the NYSHRL, NYCHRL, and New York common law, none of which require EEOC exhaustion.

21.     All other conditions precedent to this action have been satisfied, waived, or are inapplicable.

## PARTIES

22.     Plaintiff Patrice Noel is a resident of New York and, at all relevant times, was employed in New York County. She is an "employee" within the meaning of the ADA, Title VII, the NYSHRL, and the NYCHRL.

---

[1] See *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 56–59 (1974) (statutory discrimination claims may not be delayed or subordinated to arbitration); *McDonald v. City of West Branch*, 466 U.S. 284, 289–90 (1984) (civil-rights claims cannot be stayed in deference to arbitration); *Barrentine v. Arkansas-Best Freight*, 450 U.S. 728, 740–46 (1981).

23.     Upon information and belief, Defendant Neighborhood Defender Service Inc. ("NDS") is a not-for-profit legal services organization with its principal place of business in New York County. NDS operates as "Neighborhood Defender Service of Harlem" and is an "employer" under all applicable federal, state, and city laws.

24.     Upon information and belief, Defendant Association of Legal Aid Attorneys – UAW Local 2325 ("ALAA") is a labor organization with its principal place of business located in New York, New York. At all relevant times, ALAA served as the exclusive bargaining representative for NDS employees, including Plaintiff. ALAA owed Plaintiff a duty of fair representation under federal labor law and breached that duty through arbitrary, discriminatory, and bad-faith handling of her grievance.

25.     Upon information and belief, Defendant Amy Armstrong is a resident of New York and, at all relevant times, served as Plaintiff's Team Supervisor in the Family Defense Practice at NDS Harlem. Armstrong escalated vague, subjective complaints about Plaintiff's work to Defendant Akbar without first raising them with Plaintiff, triggering the medically harmful daily check-in structure. When Plaintiff later notified Armstrong that this supervision was exacerbating her PTSD and ADHD symptoms, Armstrong declined to intervene and instead imposed additional oversight by requiring her presence in meetings between Plaintiff and junior attorneys—oversight that had not existed before Plaintiff sought an accommodation. Armstrong's conduct and omissions directly contributed to the discriminatory and retaliatory conditions described herein, rendering her individually liable under the NYSHRL and NYCHRL.

26.     Upon information and belief, Defendant Zainab Akbar is a resident of New York and, at all relevant times, served as Managing Attorney of the FDP at NDS Harlem and Plaintiff's supervisor. Akbar was aware of Plaintiff's PTSD and ADHD diagnoses and the

specific trauma Plaintiff experienced during military service, as well as Plaintiff's verbal and written accommodation requests. Despite this knowledge, Akbar implemented the medically harmful daily check-in supervisory structure, ignored Plaintiff's accommodation requests, and later interfered with the grievance process. Akbar's actions and omissions materially contributed to the discriminatory and retaliatory conditions described herein, rendering her individually liable under the NYSHRL and NYCHRL.

27.     Upon information and belief, Defendant Jacob Schneider is a resident of New York and, at all relevant times, served as Deputy Managing Attorney of the FDP. Schneider had direct knowledge of Plaintiff's PTSD-related limitations, ADHD, and accommodation requests, and was repeatedly copied on communications documenting the discriminatory supervision and its harmful effects. Despite this knowledge and his authority as a senior manager, Schneider failed to intervene, prevent, or correct the discriminatory and retaliatory conduct directed at Plaintiff. He is individually liable under the NYSHRL and NYCHRL.

28.     Upon information and belief, Defendant Myranda Mendez is a resident of New York and, at all relevant times, served as Plaintiff's direct supervisor. Mendez was aware of Plaintiff's PTSD- and ADHD-related limitations, yet continued to enforce the harmful daily check-in structure, escalated concerns about Plaintiff's behavior rather than engaging in the interactive process, and failed to intervene despite knowing the supervision was exacerbating Plaintiff's symptoms. Mendez's actions and omissions materially contributed to the discriminatory and retaliatory conditions described herein, rendering her individually liable under the NYSHRL and NYCHRL.

29.     Upon information and belief, Defendant Danté Browne is a resident of Michigan and, at all relevant times, served as Director of Human Resources for NDS Inc. Browne was

aware of Plaintiff's PTSD- and ADHD-related limitations, yet initiated and approved the termination process based on an unsubstantiated 'safety threat' allegation that she knew—or should have known—was false. Browne communicated the disciplinary decisions, withheld grievance-related information, and failed to intervene despite having authority to correct the discriminatory and retaliatory actions taken against Plaintiff. Browne's conduct renders her individually liable under the NYSHRL and NYCHRL.

30.    Upon information and belief, Defendant Carolyn Klemens is a resident of New York and, at all relevant times, served as Human Resources Manager at NDS Harlem. Klemens was aware of Plaintiff's PTSD, ADHD, and military-service-related trauma, yet willfully mischaracterized Plaintiff's disability-related disclosure as a workplace 'threat,' delayed approval of Plaintiff's requested accommodations, failed to act on Plaintiff's discrimination complaint, and escalated the allegation without investigation. Klemens's actions and omissions directly contributed to the discriminatory and retaliatory conduct described herein, rendering her individually liable under the NYSHRL and NYCHRL.

31.    Upon information and belief, Defendant Matthew Knecht is a resident of New York and, at all relevant times, served as Chief of Counsel for NDS. Knecht had direct knowledge of Plaintiff's PTSD, ADHD, and military-service trauma, yet obstructed the grievance process, denied or failed to implement Plaintiff's disability-related accommodations, and issued the Step 2 grievance decision against Plaintiff despite evidence directly contradicting the stated basis for discipline. Knecht's actions and omissions materially contributed to the discriminatory and retaliatory treatment described herein, rendering him individually liable under the NYSHRL and NYCHRL.

32.     Upon information and belief, Defendant Roxanna Gutierrez is a resident of New York and, at all relevant times, served as General Counsel for NDS Harlem. Gutierrez was repeatedly copied on communications detailing Plaintiff's PTSD- and ADHD-related limitations, military-service trauma, and complaints of discrimination and retaliation, yet took no action to intervene, correct the misconduct, or halt the unlawful supervision and discipline. Her failure to act despite knowledge and authority to do so materially contributed to the discriminatory and retaliatory treatment described herein, rendering her individually liable under the NYSHRL and NYCHRL.

33.     Upon information and belief, Defendant Piyali Basak is a resident of New York and, at all relevant times, served as Managing Director of NDS Harlem. Basak presided over Plaintiff's Step 2 Grievance Hearing, initially denied Plaintiff's requested recording accommodation and then imposed retaliatory conditions on its approval. Despite direct awareness of Plaintiff's discrimination, retaliation, and disability-related concerns, Basak failed to intervene or prevent the continuation of unlawful conduct. Her actions and omissions materially contributed to the discriminatory and retaliatory treatment described herein, rendering her individually liable under the NYSHRL and NYCHRL.

34.     Upon information and belief, Defendant Shannon Anglero is a resident of New York and, at all relevant times, served as Deputy Executive Director of NDS Inc. Anglero had direct knowledge of Plaintiff's disability-related accommodation requests, grievance-access concerns, and reports of discriminatory treatment, yet participated in decisions restricting Plaintiff's access to accommodations and grievance procedures and failed to intervene to prevent ongoing misconduct. Her actions and omissions materially contributed to the discriminatory and

retaliatory treatment described herein, rendering her individually liable under the NYSHRL and NYCHRL.

35.    Upon information and belief, Defendant Rick Jones is a resident of New York and, at all relevant times, served as Executive Director of Neighborhood Defender Service Inc. On July 10, 2025, Plaintiff sent Jones a detailed written complaint outlining disability discrimination, racial bias, and retaliation at NDS. Despite being placed on direct notice and possessing full authority to investigate, correct, or remove supervisors engaged in unlawful conduct, Jones failed to respond, intervene, or take any remedial action. His inaction, despite knowledge and a duty to stop ongoing discrimination, materially contributed to the unlawful treatment described herein and constitutes aiding, abetting, and failure to intervene under the NYSHRL and NYCHRL. He is subject to the jurisdiction of this Court for acts and omissions committed in New York County in his individual capacity.

36.    Plaintiff reserves the right to amend this Complaint to add additional individuals, entities, or union representatives revealed through discovery to have participated in, contributed to, or facilitated the unlawful conduct described herein.

37.    References to 'Neighborhood Defender Service,' 'Neighborhood Defender Service of Harlem,' or 'NDS' include its managers, HR personnel, attorneys, supervisors, and agents acting within the scope of their authority or in concert with one another. References to the 'Association of Legal Aid Attorneys' or 'ALAA–UAW Local 2325' include union officials and staff responsible for Plaintiff's representation or grievance processing. This definition does *not* include NDS Harlem delegates, who are employees of NDS and not employees or agents of ALAA.

**FACTUAL ALLEGATIONS**

### I. "This is not like the military, I'm trying to help you..."-Akbar

38.    Plaintiff Patrice Noel is a Black woman, U.S. Army veteran, and legal professional with over ten years of experience. She has been diagnosed with service-connected Post-Traumatic Stress Disorder (PTSD) and Attention Deficit Hyperactivity Disorder (ADHD), both qualifying disabilities under the ADA, the NYSHRL, and NYCHRL.

39.    In or around July 2024, NDS hired Plaintiff as a Litigation Assistant/Paralegal ("LA") in its Family Defense Practice at the Harlem office. Plaintiff was part of the very first cohort of six Litigation Assistants hired to inaugurate and shape this newly created role, making her not only an employee but also a participant in defining the position's structure and expectations.

40.    On July 2, 2024, following Plaintiff's second interview with Defendants Akbar and members of the FDP, Plaintiff sent a thank-you letter confirming her understanding of the position's benefits and work environment as represented during the hiring process. (See attached as *Exhibit B).*

41.    In the letter, Plaintiff specifically referenced her excitement about "the benefits and opportunities at NDS" and described NDS as a "healthy and welcoming work environment," reflecting her reliance on Defendants' statements that the role included paid time off to study for the Uniform Bar Exam ("UBE"), disability-inclusive policies, and a trauma-informed supervisory approach.

42.    Plaintiff was assigned to Team Supervisor Armstrong and directly overseen by Supervisor Myranda Mendez, Deputy Practice Managing Attorney Schneider, and Practice Managing Attorney Akbar.

43.     Plaintiff initially received positive feedback regarding her communication and engagement. However, Armstrong soon began subjecting her to heightened micromanagement and scrutiny, soliciting performance commentary from junior attorneys, treatment not applied to other LAs by their supervisors.

44.     In or around September 2024, Plaintiff was informed she would receive a "two-month feedback meeting," which NDS claimed would be bilateral and was standard for all LAs. In truth, Defendants only arranged these meetings after Armstrong raised concerns about Plaintiff. They used the process to single her out under the guise of neutrality, retroactively framing it as routine.

45.     On or about October 11, 2024, based solely on Armstrong's unverified complaints, Akbar imposed a daily supervisory check-in structure on Plaintiff. No other Litigation Assistant was subjected to this level of intrusive oversight.

46.     Defendants imposed this structure without any individualized assessment, documentation of performance deficiencies, or opportunity for Plaintiff to self-correct.

47.     These adverse measures were rooted in biased perceptions of Plaintiff's identity as a disabled Black woman. Plaintiff was the only LA subjected to escalating scrutiny and ultimately terminated.

48.     On or about October 17, 2024, Plaintiff verbally disclosed to Akbar that the check-ins were exacerbating her PTSD symptoms and requested a trauma-informed alternative as a reasonable accommodation.

49.     Akbar stated that this wasn't like the military and summarily denied the request, failing to initiate the interactive process required under the ADA. She proposed no alternative and gave no legitimate justification for the continued imposition of the harmful structure.

50. Plaintiff further explained that when her PTSD symptoms are triggered—particularly in a high-surveillance or overly controlled environment—they compound with her ADHD to cause cognitive overload. This dual activation impairs concentration, short-term memory, processing speed, and task sequencing, all of which are essential for managing complex legal matters, meeting deadlines, and ensuring accuracy.

51. Plaintiff expressly warned Akbar that the daily check-ins would make her performance worse, as they heightened hypervigilance, disrupted focus, and eroded her ability to complete tasks efficiently. Rather than mitigate these effects through reasonable accommodations, Defendants continued the practice, causing the very performance issues they later used as a pretext for discipline.

52. Mendez, who conducted the check-ins, knew they were causing harm but falsely reported to Akbar that they were "beneficial," despite no measurable improvement. She failed to advocate for Plaintiff or report the harm, violating her duties under NYCHRL § 8-107(13)(b).

53. Between October 17, 2024 and November 25, 2024, Plaintiff's health and workplace performance deteriorated directly due to Defendants' refusal to provide timely and effective accommodations.

54. On October 30, 2024, Plaintiff submitted a written accommodation request to Akbar, Mendez, and Schneider, proposing trauma-informed alternatives. Defendants ignored the request and failed to respond or engage in an individualized, good-faith dialogue as required by the ADA, NYSHRL, and NYCHRL.

55. On October 31, 2024, Plaintiff emailed HR Manager Klemens requesting a meeting to discuss accommodations, medical leave, and concerns about Akbar's discriminatory treatment. Klemens met with Plaintiff the following day, November 1, 2024.

56.     On November 6, 2024, Klemens demanded Plaintiff submit her accommodation request in writing with supporting medical documentation. She refused to implement interim accommodations. She also denied Plaintiff's request to combine disability leave with bar exam study leave, claiming the benefit did not apply to LAs.

57.     That same day NDS held a training on trauma, boundaries, and wellness led by supervising social worker Dori Brail. Before the session, Plaintiff confided in Brail about the discriminatory supervision she was experiencing under Akbar. Although she had not planned to disclose her PTSD diagnosis, the severity of her distress compelled her to do so. Brail, the only licensed social worker in the FDP, listened attentively. Social Work Supervisor Helen Moltavan was also present and overheard the disclosure.

58.     Plaintiff explained to Brail and Moltavan that the supervision structure was discriminatory and worsening her trauma symptoms. Both acknowledged her concerns and attempted to assist—Brail recommending that her therapist document the cognitive effects of trauma triggers and introducing the "fight, flight, or freeze" framework as a way to describe them. Neither is named as a defendant because they listened and sought to help, NDS later prohibited them from testifying and instead weaponized the very framework Brail shared, using it to justify Plaintiff's suspension.

## II. "It seems like you want special privileges." - Klemens

59.     On November 18, 2024, following NDS Harlem Union guidance and in consultation with Akbar, Plaintiff submitted a comprehensive, four-page self-directed performance improvement plan to Akbar, Mendez, and Schneider. Defendants ignored it and offered no feedback.

60.     That same day, Plaintiff sent Klemens a letter from her treating therapist, with a more detailed recommendation to follow. She reiterated that the check-in structure aggravated her PTSD and requested an update on her leave request and accommodations.

61.     Later that evening, Plaintiff emailed Klemens a second letter from her provider, which included specific accommodation recommendations. She asked for a timely response and guidance on implementation.

62.     On November 19, 2024, Klemens acknowledged receipt but said she was prioritizing payroll and would respond by the end of the week. She asked Plaintiff to confirm whether the daily check-ins were still ongoing. Plaintiff confirmed that they were.

63.     On November 21, she met with Klemens and HR Director Browne. Though they acknowledged her requests, they took no immediate action.

64.     Plaintiff reported Armstrong's racial bias to Browne and HR. Defendants ignored the complaint. Plaintiff also tried to report Akbar's disability-related misconduct, but Klemens took no action. Akbar and Klemens instead reframed Plaintiff's trauma responses as character flaws.

65.     On November 25, 2024—six weeks after her initial request and one week after her therapist's formal submission—NDS approved Plaintiff's accommodation request. However, the harm had already occurred.

66.     That same day, Akbar emailed Plaintiff confirming her accommodations, including reduced supervisory check-ins. However, Akbar also stated that weekly check-ins with Mendez would begin that week and requested to schedule a disciplinary meeting with HR present. She acknowledged Plaintiff's right to union representation and confirmed the disciplinary nature of the meeting.

67.    Plaintiff responded that she was unwell and requested a list of alleged deficiencies, and requested Armstrong be a part of the conversation.

68.    Akbar confirmed the meeting was disciplinary but refused to provide any supporting documentation. Mendez and Schneider, copied on the email, remained silent.

69.    On November 26, 2024, with Klemens now copied on the same thread, Plaintiff informed Akbar that her union representative was unavailable and asked to reschedule. Plaintiff also requested permission to conduct intake remotely because the recent disciplinary notification made clear that Armstrong had initiated or contributed to the allegations, which could cause Armstrong's presence to potentially trigger acute PTSD symptoms.

70.    Akbar denied the remote work request, claiming intake must be performed in person. Plaintiff explained that the request fell within her flexible scheduling accommodation and was necessary to manage trauma symptoms.

71.    Plaintiff emphasized that LAs had previously performed intake remotely and that the role was newly created with flexible functions.

72.    Due to Akbar's denial of accommodations on the Nov 26 Email, Klemens and Browne met with Plaintiff to go over what accommodations had already been granted. She requested union representation knowing the potential for escalation due to the prolonged denial and discrimination, but Klemens denied the request without reason.

73.    During the meeting, Plaintiff described the "fight, flight, or freeze" trauma response that anyone with PTSD experiences and explained how Armstrong's presence *could* trigger a reaction. Klemens mischaracterized this as a threat.

74.    Plaintiff immediately clarified that she was describing a medically recognized symptom of PTSD, not making a threat. Klemens refused to accept the clarification. When asked

whether she perceived a threat, Browne declined to respond and proposed reconvening the next day.

75.    That evening, Defendants locked Plaintiff out of her work systems and emailed her a suspension notice. The notice cited her PTSD-related disclosure as the basis for suspension, reframing her protected disclosure as a workplace threat.

76.    The suspension occurred one day after NDS approved her accommodation request and while her Short Term Dissability application was still pending. The timing and rationale reflect unlawful retaliation and disability discrimination under applicable law.

77.    The notice did not cite any actual misconduct, nor did it reference possible termination. Defendants' concealment deprived Plaintiff of her due process rights under the Collective Bargaining Agreement (CBA) and denied her union the opportunity to grieve the suspension.

78.    During Plaintiff's suspension, Akbar communicated with the union regarding Plaintiff's return. However, on December 12, 2024, fifteen minutes after Akbar's email, HR converted the suspension to a termination without further process or notice.

**III. "NDS approved Ms. Noel's sole *written* request for disability accommodations."-Knecht**

79.    Post Termination, Plaintiff attempted to assert her rights through NDS's grievance process, but Defendants weaponized the procedure against her. Knecht, Basak, and Anglero imposed retaliatory restrictions—banning recordings, excluding Plaintiff's chosen union representatives, and refusing to remove conflicted HR personnel such as Klemens.

80.    Knecht falsely claimed that NDS had "no obligation" to investigate the "threat" allegation, despite contemporaneous evidence, including guidance from the Job Accommodation

Network and procedure outlined in NDS Employee Handbook. (See *Exhibit C*- NDS' 5/21/25 Response to the Union).

81.    Akbar and Knecht deliberately withheld critical testimony from social workers Dori Brail and Helen Moltavan, even instructing staff not to cooperate—conduct in direct violation of NYCHRL § 8-107(13)(b), which requires employers to take steps to prevent and remedy discrimination.

82.    Instead, on June 27, 2025, Knecht issued the Step 2 grievance decision, rehashing dead arguments about probationary status and stating: "NDS did not engage in discrimination based on disability. NDS approved Ms. Noel's sole written request for disability accommodations." (*Exhibit D*- Step 2 grievance decision)

83.    Meanwhile, Akbar and Klemens spread false claims that Plaintiff was unprofessional, emotionally unstable, or a safety threat. These defamatory statements were circulated internally, externally, and to union members, severely harming Plaintiff's reputation and career prospects.

84.    Knecht and Anglero reinforced this false narrative by denying Plaintiff documentation, blocking investigation, and repeatedly framing her protected disclosures as "threatening."

85.    The grievance process, which will be a year old this January 2026, functioned as a tool to obstruct Plaintiff's claims, silence her advocacy, and prolong the psychological harm. Knecht and Basak ignored her written accommodation requests, denied procedural rights, and enforced retaliatory conditions in violation of the ADA.

86.    Anglero and Knecht further upheld discriminatory procedures by initially refusing to remove conflicted HR staff.

87.    On July 10, 2025, Plaintiff sent a detailed letter to Executive Director Rick Jones and the NDS Board of Directors outlining the systemic failures of the grievance process, the mischaracterization of her PTSD disclosure as a "threat," and the racialized framing of her conduct.

88.    Plaintiff warned that NDS's treatment of her reflected broader ableist and anti-Black cultural failures affecting both staff and clients. Despite this notice, Jones and the Board took no action—further evidencing their ratification of discriminatory conduct and indifference to Plaintiff's rights.

89.    As a direct result of Defendants' conduct, Plaintiff lost her job, housing, health insurance, bar exam study leave, and the opportunity to sit for the bar exam. She experienced a severe psychological crisis requiring a 28-day stabilization program, 2 new psychiatric medications, and long-term reliance on a service dog.

90.    Defendants knew of Plaintiff's disabilities, her bar exam goals, and her history of academic struggles due to systemic issues. Yet they acted with deliberate disregard, obstructing her recovery and professional advancement.

91.    Defendants compounded the harm by spreading stigmatizing, false claims of insubordination, "special privileges," and instability—eroding peer support and deepening the hostile environment post termination.

92.    All Defendants had actual or constructive knowledge of Plaintiff's disabilities, complaints, and accommodation requests. Yet they coordinated to eliminate her, suppress evidence, and discredit her.

93.    NDS also refused to forward Plaintiff's legal demand letters directed to Mendez and Browne, further obstructing resolution.

94.    On or about November 11, 2025, NDS submitted a Pre-Hearing Arbitration Brief that continued to mischaracterize Plaintiff's PTSD disclosure as a 'misconduct,' omitted critical accommodation documentation, and advanced a legally erroneous interpretation of the CBA to restrict arbitral review of discrimination claims. While the brief is privileged for defamation purposes, it is admissible as evidence of pretext, retaliatory motive, and NDS's ongoing efforts to obstruct Plaintiff's contractual rights.

95.    Following the filing of this lawsuit, the only individuals who alleged that Plaintiff posed a 'safety threat' during the November 26, 2024 meeting—Defendants Carolyn Klemens and Danté Browne—are no longer employed by NDS. Defendant Matthew Knecht, who oversaw and approved the termination process, has also departed the organization.

96.    Plaintiff does not assert the reasons for these departures. Nonetheless, despite the removal of every person involved in creating, approving, or supporting the alleged 'safety threat' narrative, Defendants have taken no steps to correct the record, retract the allegation, or remediate the continuing harm caused to Plaintiff. These developments underscore the procedural failures surrounding Plaintiff's case and reflect broader institutional instability and internal recognition that serious errors occurred.

97.    As a result of Defendants' conduct, Plaintiff asserts claims under applicable law as outlined in the below causes of action.

## IV. "There's nothing we can do."-ALAA

98.    From October through mid-November 2024, NDS denied Plaintiff's accommodations for approximately six weeks. During this period—before the suspension—Plaintiff repeatedly sought assistance from ALAA–UAW Local 2325, and Harlem delegates likewise notified ALAA that Plaintiff needed support and asked for guidance.

99.    ALAA did not intervene when NDS denied Plaintiff union representation at the November 26 meeting that led to her suspension. After the suspension, Plaintiff and Harlem delegates again contacted ALAA; staff advised that the suspension should not be grieved because it was "inconsequential". Then when they were wrong and Plaintiff was terminated, they shifted focus to severance language instead of challenging discriminatory discipline.

100.    After Plaintiff's December 2024 termination, ALAA's position did not change. In a December 2024 email exchange, Harlem delegates again sought guidance. ALAA responded that "there isn't more we can do," incorrectly asserting that the CBA's discipline clause prevented a grievance and failing to recognize Article 3.1.1's nondiscrimination protections. (Exhibit E – 12/19–12/24 ALAA–Delegate Email Chain).

101.    Throughout the grievance process, ALAA conducted no independent investigation, did not review Plaintiff's medical documentation, did not interview witnesses, did not address conflicts of interest, and allowed NDS's framing to proceed unchallenged. Although copied on the email chain between NDS, Plaintiff, and the Harlem delegates, ALAA remained effectively silent, leaving the delegates without meaningful guidance.

102.    As the matter proceeded to arbitration, ALAA ignored repeated requests for updates, strategy, and support. ALAA did not oppose NDS's request to stay the arbitration, did not seek an expedited merits hearing, and submitted briefing that omitted essential civil-rights analysis needed to preserve Plaintiff's remedies.

103.    The December 2025 Interim Award—staying the merits until the conclusion of this lawsuit—was issued on this undeveloped record, an outcome directly impacted by ALAA's failure to present civil-rights arguments. (Exhibit F – Interim Award). When Plaintiff asked ALAA to seek reconsideration and preserve the January 8 hearing date, ALAA refused, stating

there was "no legal basis" and "nothing we can do"; Only after further discussion did counsel acknowledge the true reason for refusal: "I would not feel comfortable submitting a motion for reconsideration in this case." Plane even submitted a full draft of motion for reconsideration with valid legal basis and still no response. ALAA offered no alternative path to protect Plaintiff's rights. (Exhibit G – Grievance Communications Reflecting ALAA's Non-Participation).

104.    ALAA's failure to investigate, advocate, guide Harlem delegates, challenge discriminatory discipline, or seek reconsideration was arbitrary, discriminatory, and in bad faith. By abandoning its role while copied on all relevant communications, ALAA left NDS's discriminatory conduct unopposed. Its failures magnified the harm caused by NDS and deprived Plaintiff of the fair representation required under federal law.

105.    As a result of Defendants' conduct, Plaintiff asserts claims under applicable law as outlined in the below causes of action.

### FIRST CAUSE OF ACTION
**Disability Discrimination and Failure to Accommodate**
**(Title I of the ADA, 42 U.S.C. § 12112; NYSHRL § 296; NYCHRL § 8-107)**
**(Against Defendant NDS Inc., ALAA–UAW Local 2325 and Individual Defendants)**

106.    Plaintiff realleges and incorporates all preceding paragraphs. Defendants had actual knowledge of Plaintiff's qualifying disabilities at all relevant times.

107.    Despite that knowledge, Defendants discriminated against Plaintiff and failed to accommodate her disabilities by: (a) imposing a medically contraindicated daily "check-in" structure; (b) refusing to engage in the interactive process; (c) delaying and denying requested accommodations; (d) mischaracterizing a PTSD-related disclosure as a "threat"; and (e)

terminating Plaintiff before the approved accommodations could take effect. (See *Exhibit H* – November 26 Email Thread, accommodation request that led to termination.)

108. Plaintiff was treated less favorably than non-disabled employees and subjected to heightened scrutiny, disparate discipline, and adverse actions grounded in stereotypes and symptoms of her disabilities.

109. Each Individual Defendant personally participated in, directed, or knowingly permitted this discriminatory conduct.

110. With respect to the NYSHRL and NYCHRL components of this claim, ALAA– UAW Local 2325 further contributed to the discriminatory treatment by disregarding Plaintiff's disability-related concerns, failing to advocate for or protect her accommodation rights during the disciplinary process, and permitting NDS's discriminatory narrative to proceed unchallenged despite knowing that the allegations were rooted in Plaintiff's PTSD- and ADHD-related symptoms. ALAA's failure to intervene or correct the record materially aided and abetted the ongoing discrimination in violation of state and city law.

111. Defendants' conduct was intentional, willful, and in reckless disregard of Plaintiff's statutory rights, causing severe professional, psychological, emotional, and financial harm. Plaintiff's damages include the severe worsening of her PTSD and trauma after termination, which left her vulnerable to significant emotional deterioration, medical escalation, and the heightened impact of subsequent traumatic events.

112. Plaintiff seeks all remedies available under applicable law, as set forth in the prayer of relief.

## SECOND CAUSE OF ACTION
**Retaliation and Interference Based on Disability
(ADA, 42 U.S.C. § 12203; NYSHRL § 296(7); NYCHRL § 8-107(7))
(Against NDS Inc., ALAA–UAW Local 2325 and Defendants Akbar, Klemens, Knecht,
Browne, Basak, Anglero, Mendez, and Jones)**

113.    Plaintiff realleges and incorporates all preceding paragraphs.

114.    Plaintiff engaged in protected activity by requesting reasonable accommodations, disclosing disability-related limitations, and objecting to supervision practices that exacerbated her conditions.

115.    In retaliation, Defendants: denied accommodations; suspended Plaintiff one day after approving her written request; mischaracterized a PTSD-related disclosure as a "threat"; (See Exhibit I– Suspension Notice.) terminated her before accommodations could be implemented; obstructed the grievance process; and suppressed favorable witness participation. Post-termination, Defendants further interfered with Plaintiff's rights by conditioning accommodations on surrendering union protections and restricting grievance-related access.

116.    With respect to the NYSHRL and NYCHRL components of this claim, ALAA–UAW Local 2325 further retaliated against Plaintiff by discouraging delaying or withholding representation during disability-related discipline, refusing to file a motion for reconsideration as mentioned above, and allowing NDS's discriminatory narrative to proceed unchallenged. ALAA's failure to intervene, protect Plaintiff's rights, or correct known mischaracterizations of her disability-related disclosures materially aided and abetted the retaliation and interference prohibited by state and city law.

117.    The Individual Defendants directly participated in or knowingly facilitated these retaliatory actions with the intent to punish and deter Plaintiff for exercising protected rights.

118.    Plaintiff suffered economic loss, reputational harm, emotional distress, and disruption of ongoing medical care. Her damages further include a significant worsening of her PTSD and trauma symptoms following termination, which left her acutely vulnerable to emotional deterioration, required medical escalation, and amplified the impact of subsequent traumatic events.

119.    Plaintiff seeks all available remedies, as set forth in the prayer of relief.

### THIRD CAUSE OF ACTION
### Race Discrimination – Title VII, NYSHRL, NYCHRL
### (Against NDS Inc., ALAA–UAW Local 2325  and Defendants Akbar, Klemens, Basak, Browne, Anglero, Knecht, and Jones)

120.    Plaintiff realleges and incorporates all preceding paragraphs.

121.    Plaintiff is a Black woman with service-connected PTSD and ADHD, placing her at the intersection of multiple protected classifications.

122.    Defendant, through Supervisory, HR, and leadership personnel subjected Plaintiff to racially discriminatory treatment, including heightened scrutiny, distorted interpretations of her conduct, and adverse actions not imposed on similarly situated non-Black employees.

123.    Racial stereotypes, particularly the trope of the "angry" or "unstable" Black woman, shaped how Plaintiff's trauma disclosures were received and how her  accommodation requests were evaluated.

124.    Management credited biased accounts from white staff over Plaintiff's explanations and medical documentation, branded her a "threat," and relied on that narrative to justify suspension and termination. (See *Exhibit I.*)

125.    With respect to the NYSHRL and NYCHRL components of this claim, ALAA–UAW Local 2325 further contributed to the race-based discrimination by disregarding Plaintiff's

reports of racially biased treatment, declining to challenge NDS's racially coded "threat" narrative, and failing to provide equal representation or advocacy during disciplinary proceedings. ALAA's refusal to intervene or correct the racially distorted account of Plaintiff's conduct materially aided, abetted, and perpetuated the discriminatory actions taken against her in violation of state and city law.

126.    These acts violated Title VII and constitute unlawful discrimination under NYSHRL and NYCHRL, which prohibit both direct and indirect race-based mistreatment in employment. Individual Defendants are liable under N.Y. Exec. Law § 296(6) and N.Y.C. Admin. Code § 8-107(6) for aiding, abetting, or failing to remedy the discrimination.

127.    Plaintiff suffered economic loss, reputational harm, emotional distress, and disruption of ongoing medical care. Her damages further include a significant worsening of her PTSD and trauma symptoms following termination, which left her acutely vulnerable to emotional deterioration, required medical escalation, and amplified the impact of subsequent traumatic events.

128.    Plaintiff seeks all available remedies, as set forth in the prayer of relief.

### FOURTH CAUSE OF ACTION
**Hostile Work Environment – Title VII, ADA, NYSHRL, NYCHRL**
**(Against NDS Inc., ALAA–UAW Local 2325 and Individual Defendants)**

129.    Plaintiff realleges and incorporates all preceding paragraphs.

130.    Defendants created and maintained a hostile work environment based on Plaintiff's race and disabilities, including heightened scrutiny, disparate discipline, exclusion from workplace processes, and reliance on racial stereotypes and disability stigma to justify adverse action. Most significantly, Defendants aggravated Plaintiff's PTSD by refusing to accommodate for over six weeks. (See *Exhibit H* – November 26 Email Thread.)

131. The hostile environment continued after Plaintiff's termination through obstruction of the grievance process, suppression of favorable witnesses, and repetition of defamatory disability-related narratives.[2] (See *Exhibit J, Exhibit K* – Post-termination grievance correspondence showing suppression of supportive testimony and continued defamatory statements).

132. With respect to the NYSHRL and NYCHRL components of this claim, ALAA– UAW Local 2325 contributed to the hostile work environment by ignoring Plaintiff's reports of race- and disability-based mistreatment, failing to intervene in NDS's escalating conduct, and allowing the false "threat" narrative to stand unchallenged. Post-termination, ALAA's delays in representation and refusal to correct discriminatory characterizations further perpetuated the hostile environment. This knowing inaction materially aided and abetted the hostility in violation of state and city law.

133. The conduct described hearing was carried out with the knowledge, participation, or approval of the individual defendants either directly engaged in this conduct or failed to intervene despite having authority to do so.

134. Defendants acted intentionally and with reckless disregard for Plaintiff's statutory rights, causing sustained professional, emotional, and financial harm. Plaintiff's damages include the severe worsening of her PTSD and trauma after termination, which left her vulnerable to significant emotional deterioration, medical escalation, and the heightened impact of subsequent traumatic events.

---

[2] Post-employment retaliation is actionable when tied to the prior employment relationship. *See Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997); *Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 89 (2d Cir. 2010).

135.    Plaintiff seeks all remedies available under applicable law, as separate worth in the prayer of relief.

## FIFTH CAUSE OF ACTION
### Disparate Discipline and Termination – Title VII, ADA, NYSHRL, NYCHRL
### (Against NDS Inc. and Defendants Akbar, Klemens, Knecht, Basak, Browne, Schneider, Anglero, Mendez, Gutierrez, and Jones)

136.    Plaintiff realleges and incorporates all preceding paragraphs.

137.    Defendants disciplined and terminated Plaintiff based on her race, disabilities, and protected activity, in violation of federal, state, and city law.

138.    Defendants bypassed standard performance-improvement measures and escalated directly to termination, whereas similarly situated non-Black, non-disabled employees with equal or greater deficiencies received informal correction or accommodations without HR involvement or medical documentation.

139.    Other Litigation Assistants experienced similar challenges attributed to Plaintiff but were not subjected to heightened oversight.

140.    Another employee made an actual workplace "threat" in jest yet faced no comparable discipline. Defendants' selective enforcement demonstrates selected enforcement pretext. (See *Exhibit L* – screenshot evidence of Akbar confirming desperate response).

141.    Following Plaintiff's termination, NDS materially altered the Litigation Assistant role by assigning a dedicated supervisor and substantially revising duties, which not only confirmed the role could have been restructured to avoid the alleged performance issues, but also implicitly acknowledged significant flaws in the supervisory structure under which Plaintiff was required to work.

142.    Each named individual Defendant participated in, approved, or failed to prevent discriminatory and retaliatory discipline.

143.    As a result, Plaintiff suffered significant professional, economic, and emotional harm. Plaintiff's damages include the severe worsening of her PTSD and trauma after termination, which left her vulnerable to significant emotional deterioration, medical escalation, and the heightened impact of subsequent traumatic events. She seeks all remedies available, as set forth in the prayer of relief.

## SIXTH CAUSE OF ACTION
### Race-Based Retaliation
### (Title VII; NYSHRL § 296(7); NYCHRL § 8-107(7))
### (Against NDS Inc., ALAA–UAW Local 2325 and Defendants Akbar, Schneider, Klemens, Browne, Knecht, Gutierrez, Basak, Anglero, and Jones)

144.    Plaintiff realleges and incorporates all preceding paragraphs.

145.    Plaintiff engaged in protected activity by reporting race-based bias, including disparate standards, skewed credibility assessments, and racially discriminatory treatment.

146.    Plaintiff informed HR that Akbar uncritically accepted Armstrong's negative account over plaintiffs own explanation, and that Armstrong changed her communication style toward Plaintiff out of discomfort—behavior not directed toward white staff or non-black Junior staff. These facts have been documented in writing or witnessed by staff and union members.

147.    Defendants ignored these complaints, further manipulated supervision, suspension, and grievance procedures to punish Plaintiff for raising race-related concerns, with full awareness that such actions would compound her prior experiences of racial trauma.

148.    The proximity of these actions to Plaintiff's complaints, and their selective nature, support a clear inference of retaliatory motive.

149.     With respect to the NYSHRL and NYCHRL components of this claim, ALAA–UAW Local 2325 further retaliated against Plaintiff by disregarding her reports that racial bias contributed to the adverse actions taken against her and by declining to challenge NDS's race-charged narrative during the grievance process. ALAA's continued refusal to advocate for Plaintiff after she raised race-related concerns, and its failure to take corrective action despite knowing these issues affected her credibility and access to due process, constitute unlawful retaliation and aiding and abetting under N.Y. Exec. Law § 296(7) and N.Y.C. Admin. Code § 8-107(7).

150.     Defendants' conduct violated Title VII, the NYSHRL, and the NYCHRL, each of which prohibits retaliation for opposing race discrimination.

151.     Plaintiff suffered economic loss, reputational damage, emotional distress, and disruption of medical care, and seeks all available remedies. Plaintiff's damages include the severe worsening of her PTSD and trauma after termination, which left her vulnerable to significant emotional deterioration, medical escalation, and the heightened impact of subsequent traumatic events.

## SEVENTH CAUSE OF ACTION

### Race Discrimination – 42 U.S.C. § 1981
**(Against NDS Inc., and Defendants Akbar, Schneider, Klemens, Browne, Knecht, Gutierrez, Basak, Anglero and Jones)**

152.     Plaintiff realleges and incorporates all preceding paragraphs.

153.     Section 1981 guarantees all persons the equal right to make and enforce employment contracts regardless of race.

154.     Plaintiff was denied contractual rights afforded to non-Black employees, including fair evaluation, continued employment, and equal access to the grievance process.

155.    Defendants relied on racialized stereotypes—labeling Plaintiff "threatening," "unstable," or "insubordinate"—to justify adverse action despite the absence of objective performance deficiencies.

156.    Individual Defendants enforced racially motivated discipline, suppressed exculpatory facts, and advanced false narratives to justify Plaintiff's removal.

157.    These actions were intentional and racially motivated in violation of § 1981.

158.    Plaintiff's damages include the severe worsening of her PTSD and trauma after termination, which left her vulnerable to significant emotional deterioration, medical escalation, and the heightened impact of subsequent traumatic events. Plaintiff seeks all remedies available under federal law.

159.    Plaintiff seeks all remedies available under applicable law, as set forth in the Prayer for Relief.

**EIGHTH CAUSE OF ACTION**
**Civil Rights Conspiracy – 42 U.S.C. § 1985(3)**
**(Against NDS Inc. and Individual Defendants Akbar, Klemens, Browne, Knecht, Basak, Anglero, Schneider, Gutierrez, Mendez, and Jones)**

160.    Plaintiff realleges and incorporates all preceding paragraphs.

161.    Under 42 U.S.C. § 1985(3), it is unlawful for two or more persons to conspire to deprive an individual of equal protection or equal privileges and immunities under the law.

162.    Defendants, acting across HR, supervisory, legal, and executive functions, agreed, expressly and tacitly, to discriminate and retaliate against Plaintiff because of her race, disabilities, and protected activity.

163.    In furtherance of this agreement, Defendants coordinated actions including: (a) imposing a medically harmful surveillance structure immediately after Plaintiff requested

trauma-informed supervision; (b) circulating suspension/termination documents that deliberately mischaracterized a PTSD-related disclosure as a "threat"; (c) obstructing the grievance process by withholding information, suppressing favorable witnesses, and predetermining outcomes; and (d) maintaining false and biased narratives despite contrary evidence.

164.    These coordinated acts occurred across multiple departments—HR, Legal, Senior Management, and Executive Leadership—placing them outside the intracorporate conspiracy doctrine.[3]

165.    NDS ratified and participated in this coordinated scheme by authorizing and condoning and executing these coordinated acts.

166.    Defendants acted with discriminatory animus toward Plaintiff with the intent to discredit, isolate, and remove her for asserting legal rights and reporting civil rights violations.

167.    NDS's repetition of the same false "threat" narrative during arbitration further evidences the coordinated deprivation of Plaintiff's rights.

168.    As a result, Plaintiff was deprived of rights secured by the ADA, Title VII, and § 1981, including equal treatment, freedom from retaliation, and due process and disciplinary and grievance proceedings.

169.    Plaintiff suffered economic loss, reputational harm, emotional distress, and disruption of medical care and seeks all available remedies. Plaintiff's damages include the severe worsening of her PTSD and trauma after termination, which left her vulnerable to significant emotional deterioration, medical escalation, and the heightened impact of subsequent traumatic events.

---

[3] See *Webb v. Goord*, 340 F.3d 105, 111 (2d Cir. 2003) (recognizing that where alleged conspirators operate across different departments or functional divisions, and coordinate to achieve an unlawful objective, the intracorporate conspiracy doctrine does not bar a § 1985(3) claim).

170.    Plaintiff seeks all remedies available under applicable law, as set forth in the Prayer for Relief.

### NINTH CAUSE OF ACTION
**"Regarded As" Disability Discrimination**
**(ADA § 12102(3); NYSHRL § 296; NYCHRL § 8-107)**
**(Against NDS Inc., ALAA–UAW Local 2325 and Individual Defendants)**

171.    Plaintiff realleges and incorporates all preceding paragraphs.

172.    The ADA, NYSHRL, and NYCHRL prohibit discrimination against an employee perceived as having a physical or mental impairment, whether or not that impairment substantially limits a major life activity.

173.    Defendants perceived Plaintiff as unstable, unfit, or impaired based on assumed or perceived symptoms of PTSD and ADHD, including perceived difficulty with multi-step tasks and sensitivity to micromanagement.

174.    Internal communications and disciplinary records mischaracterized disability-related behavior as misconduct, labeling Plaintiff "distracted," "unfocused," or "noncompliant" and suggesting that she could harm, client matters due to alleged delays. They ignored contemporaneous explanations and medical evidence.

175.    Adverse actions taken on the basis of perceived impairment violate the ADA, NYSHRL, and NYCHRL.

176.    For the NYSHRL and NYCHRL components of this claim, ALAA–UAW Local 2325 also regarded Plaintiff as disabled by uncritically adopting NDS's false characterization of her PTSD-related disclosure as a "safety threat." ALAA declined to intervene, delayed representation, and treated Plaintiff differently in grievance advocacy because of the perceived instability attributed to her disability. By failing to challenge or correct the discriminatory